HOECHST CELANESE CORPORATION and Celanese Engineering Resins, Inc., Corporations of the State of Delaware, Plaintiffs Below, Appellants,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, and London Market Insurance Companies; Columbia Casualty Insurance Company; Federal Insurance Company; First State Insurance Company; Government Employees Insurance Company; Hartford Accident & Indemnity Company; Hudson Insurance Company; New England Insurance Company; New England Reinsurance Corporation; North River Insurance Company; and Twin City Fire Insurance Company, Defendants Below, Appellees.

No. 337, 1994.

Supreme Court of Delaware.

Submitted: Feb. 28, 1995.

Decided: March 30, 1995.

Rehearing Denied April 24, 1995.

Richard E. Poole, James F. Burnett, David J. Baldwin, W. Harding Drane, Jr. and William R. Denny of Potter, Anderson & Corroon, Wilmington, and Eugene R. Anderson, Jordan S. Stanzler (argued), Lorelie S. Masters, Jean M. Farrell, Richard P. Lewis and Koorosh Talieh of Anderson, Kill, Olick & Oshinsky, Washington, DC, for appellants.

Francis J. Murphy and John S. Spadaro (argued), of Murphy, Welch & Spadaro, Wilmington, and Daniel M. Bianca, John A. Catania, Joseph P. Gunset and Anne–Rose van den Bossche of Mendes & Mount, New York City, for appellees London Market Insurers.

Before WALSH, HOLLAND, and HARTNETT, JJ.

HOLLAND, Justice.

This is an interlocutory appeal by Hoechst Celanese Corporation and Celanese Engi-

neering Resins, Inc. ("HCC") from the entry of summary judgment by the Superior Court in favor of the London Market Insurers ("London"). The Superior Court certified this interlocutory appeal on August 26, 1994. This Court accepted the appeal on September 1, 1994.

This Court has concluded that the Superior Court erred procedurally in shifting the initial burden of proof to HCC, the non-moving party. The Superior Court erred substantively in granting summary judgment to London while material facts were in dispute. Accordingly, the judgment of the Superior Court must be reversed. The matter will be remanded for further proceedings in accordance with this opinion.

### Context of Litigation

Since the early 1960's, HCC has made Celcon®, an acetal copolymer resin product. Celcon® is sold in raw pellet form to third parties, who use it to manufacture many different products. From 1978 until the late 1980's, several third-party manufacturers used Celcon® to make insert plumbing fittings. These insert plumbing fittings were incorporated into plumbing systems which were installed into apartments, condominiums, mobile homes, and other residences. Contractors, developers, plumbers, and homeowners now allege that the plumbing systems incorporating these insert fittings are defective. Manufacturers also have alleged that Celcon® caused their plumbing systems to fail.

In this action, HCC seeks to enforce excess general liability insurance coverage that it purchased from London to indemnify it in connection with products liability. HCC purchased several "claims-made" excess insurance policies from London. Those policies exist in various layers above the primary level of coverage for the period from May 1, 1988, through May 1, 1989.

■ Claims-made policies provide coverage only where the underlying claim is first made, in writing, during the policy period. Therefore, the initial focus under a claims-made policy is on the date of the first written assertion of the claim, rather than the date of the injury or the damage alleged within that claim.[1] Claims-made policyholders often purchase, for an additional premium, policy "enhancements." In return for an extra premium, additional years of coverage are purchased. Such insurance is commonly referred to as "tail" coverage. In the present case, HCC bought such tail coverage, or policy "enhancements," from London.

### London's Original Motion

On February 14, 1994, London filed a motion regarding the "trigger of coverage" provision under several of the "claims-made" insurance policies issued to HCC. London moved for summary judgment "on the basis that coverage may be triggered under the London Market 'claims-made' policies, if at all, only where the underlying claim was first asserted against HCC in writing during the policy period."[2] London's request was supported by an affidavit and cited Insuring Agreement 1. The agreement provided:

> In the event that a claim or claims are first made, in writing, against the Insured during the period of this Policy, Underwriters will indemnify the Insured for that amount of Ultimate Net Loss which the Insured shall be obligated to pay by reason of the liability....

London contended that this policy language was unambiguous.

---

**1.** Claims-made policies and occurrence-based policies are fundamentally different. An occurrence policy provides coverage for injury or damage during the policy period. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1978).

**2.** Apparently London never filed a formal motion but, rather, relied on the introductory language in the memorandum it filed in the Superior Court. In that filing, London sought a declaration that each of its "claims-made" insurance policies provided coverage only "where the individual underlying claim was first asserted against HCC in writing during the effective period of the claims-made policy in question."

If London prevailed, it stated the parties then could "proceed to narrow the scope of the dispute for these policies, by way of requests for admissions, pretrial stipulations, appropriate jury instructions, or some combination of the three."

### HCC's Original Opposition

HCC responded to London's contention that the claims-made policy language was unambiguous. It argued that the policies provided alternative trigger mechanisms which permitted HCC to notify London of *"potential claims,* and thereby extend the time period under which claims can be brought against HCC and still trigger the policy."[3] (emphasis added). In opposing London's suggested interpretation of the policy language, HCC cited two provisions in the insurance agreements.

The first provision HCC cited is Insuring Agreement 5 and is designated the Loss Notification Option ("LNO"):

> The Insured may notify a Loss to this Policy by sending a notice of such Loss, in writing, by registered or certified mail during the period of this Policy, to the entity designated in Item 7 of the Declarations, provided:
>
> (1) the Loss being notified is a Loss for which a claim or claims have already been made, in writing, against the Insured, and
>
> (2) the Loss is such that is likely to involve this Policy, and
>
> (3) the Loss has not previously been notified as a Circumstance under this Policy or any prior policy.
>
> In the event the Insured so notifies the Loss to this Policy then any claim which is made, in writing, against the Insured, as respects such Loss within [seven] years after the applicable date shown below *shall*

be deemed to have been first made, in writing, against the Insured on such date.

(emphasis added).[4]

The second provision that HCC cited in support of its argument for an alternative trigger mechanism was Insuring Agreement 4, the Notice of Circumstance ("NOC") provision:

> Whenever the Insured has information relating to a Circumstance which is likely to involve this Policy and gives notice of such Circumstance, in writing, sent by registered or certified mail during the period of this Policy, to Underwriters' representative, as set forth in the entity designated in Item 7 of the Declarations, then any claim, as respects such Circumstance, which is made, in writing, against the Insured within [seven] years from the date of the written notification of such Circumstance, to Underwriters' representative, *shall be deemed to have been first made, in writing, against the Insured on the date upon which the notice of the said Circumstance was first sent to Underwriters' representative, in writing.*

(emphasis added).[5]

HCC also presented an opposing affidavit which referred to the "enhancement" provisions and included the testimony of Geoffrey A. Harrison, one of the drafters of London's "claims-made" policy form. According to HCC, this evidence confirmed that provisions like the NOC modify the "claims first made in writing" triggering mechanism. As noted in Mr. Harrison's testimony:

> (b) if the date of such written demand for money or services was prior to the inception date of this Policy, the date of the notification of the attached Loss provided that it was notified in accordance with this Insuring Agreement 5.

Thus, the "applicable date" was the date the notice was sent to a designated entity.

---

3. HCC noted in its memorandum in opposition to London's motion that the defendants "base[d] their entire argument on a reading of a solitary policy provision. [London and the other appellees] ignore[d] other clearly relevant policy language that modifies the language they favor."

4. The policies defined a "Loss" as an "accident, including continuous or repeated exposure to the same general harmful conditions." The "applicable date" to which the LNO provision refers was defined as:

> (a) The date of the first written demand against the Insured for money or services as respects the notified attached Loss if the date of such written demand was during the period of this Policy, or

5. The policies defined "circumstance" as "an accident, including continuous or repeated exposure to the same general harmful conditions, which, although it has not yet resulted in a claim or claims being made, in writing, against the Insured for· Personal Injuries, Property Damage or Advertising Injury, is likely to result in a claim or claims being made against the Insured at some future date."

[W]ith the claims made policy—claims made against the insured policy—the trigger of coverage is when the claim is made against the insured for that claim, other than various things like *notice of circumstance,* maybe discovery and one or two other things, which would interfere with it.

(emphasis added).

Thus, HCC's answer to London's original motion in the Superior Court contended that the policies at issue are not pure "claims-made" policies. In support of its position, HCC cited the LNO and NOC provisions in the policies, which provided for seven additional years of insurance coverage. According to HCC, those LNO and NOC citations were a sufficient response to London's original motion, which only relied upon Insuring Agreement 1 for its proposition that the claims-made policies were unambiguous. HCC contended that the citations were sufficient to preclude the entry of summary judgment in London's favor.

### London's Expanded Motion
### Superior Court's Trigger Ruling

London's reply to HCC's answering brief raised an issue that was not presented in its original motion. London's reply brief argued that HCC had never given the notice required to activate the seven-year "tail" coverage. The Superior Court accepted this argument without affording HCC an opportunity to respond to the lack of notice proposition, even though London had raised it for the first time in its reply brief. The Superior Court also did not require London, the "moving party," to aver or otherwise demonstrate that the LNO and NOC policy provisions cited by HCC did not refute London's original allegation that the policy language was unambiguous.

Instead, the Superior Court ruled that it was HCC's burden to present evidence that it had given notice to activate the LNO and

NOC provisions; and, in addition, that it was HCC's burden to show that claims were made during that seven-year period.[6] In the Superior Court's view:

Plaintiffs, while arguing a legal theory under which the notice of circumstance and/or loss notification clauses of the London Market Insurers' policies might override the claims made in writing provision, proffer no facts to fit those legal theories, i.e., no notice of circumstance was made during the terms of the policies; likewise, no claims appear to have been made upon which a loss notification could be added to provide a coverage tail.

The Superior Court granted London's motion "to the extent that [HCC] may only seek coverage for claims which were made in writing during the policy period or which are losses incurred for a claim or claims that had already been made in writing during the policy period" (the "Claims–Made Trigger Ruling").

The Superior Court also found, *sua sponte,* that the policies had been negotiated. The Superior Court held that:

The insurance contracts between plaintiffs and London Market Insurers are negotiated contracts and not contracts of adhesion. Plaintiffs are sophisticated purchasers and defendants are sophisticated vendors.... The language of the London market policies is clear and unambiguous.

### HCC's Motion for Reconsideration

HCC moved for reconsideration of the Claims–Made Trigger Ruling. HCC argued that London's original motion did not require HCC to proffer particular factual evidence and that its citation to the NOC and LNO provisions was a sufficient response to refute London's original contention, based upon Insuring Agreement 1, that the insurance policies were unambiguous.[7] Thus, according to

---

6. In its reply brief in the Superior Court, London contended that the issue of whether the NOC option was triggered "disappears under HCC's failure to even allege tender of a Notice of Circumstance." The Superior Court apparently adopted London's argument regarding the "trigger" of the policies issue because it based its

ruling on the fact that HCC had failed to set forth any facts that would indicate that HCC gave London notice of potential claims.

7. HCC reasoned that such evidence "would have been irrelevant and premature in the first, or liability, phase of this declaratory judgment ac-

HCC, it should not have been deemed required to offer factual evidence that the policies' "tail" coverage provisions were actually triggered before London made receipt of notice an issue. HCC also argued that the Superior Court's finding that the insurance contracts were negotiated was contrary to the evidence. London opposed HCC's motion.

HCC filed a reply brief in support of its motion for reconsideration. HCC's reply brief in the Superior Court relied on three documents not previously cited in either its answering brief to London's motion for summary judgment, or its opening brief in support of the motion for reconsideration.[8] According to HCC, if it had the burden of presenting factual evidence of notice, those documents demonstrated that London had been given notice. HCC's reply also presented factual evidence to contradict the Superior Court's finding that the substantive provisions at issue had been negotiated. London did not move for leave to submit any facts or affidavits ·in response to the documentary evidence presented for the first time in HCC's reply brief.

### Superior Court Denies Reconsideration

The Superior Court denied HCC's motion for reconsideration (the "Reconsideration Ruling"). The Superior Court stated that the factual evidence in HCC's reply brief indicating that the LNO and NOC provisions were activated, "was available to HCC at the time of the [original] argument." Consequently, the Superior Court apparently disregarded HCC's evidence concerning notice as untimely.

According to the Superior Court, "[o]nce London proved that the language at issue in the claims-made policies was clear and unambiguous, the burden shifted to HCC to prove that there were still issues of fact remaining." The Superior Court held:

HCC also contends that the Court improperly rejected its arguments regarding the standard-form "tail" provisions, when the Court provided that HCC failed to proffer facts to fit its legal theories on this issue. HCC claims that it is not obligated to present such facts at this stage of the litigation; only facts relevant to the interpretation of policies are necessary. This argument is without merit. In a motion for summary judgment, once the moving party has shown that there are no genuine issues of material fact for trial, the burden shifts to the nonmoving party to show that there are material issues of fact. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979). Once London proved that the language at issue in the claims-made policies was clear and unambiguous, the burden shifted to HCC to prove that there were still issues of fact remaining. Because HCC was arguing that the Loss Notification Option and Notice of Circumstance provisions vitiated the claims-made provision, summary judgment briefing was precisely the time for HCC to put forth facts in support of that theory.

The Superior Court also refused to reconsider HCC's contention that the parties did not negotiate the insurance policies in question. The Superior Court reiterated its finding that the claims-made policies were negotiated contracts.

### Summary Judgment
### Appellate Review Standard

■ The issue on appeal is whether London was entitled to summary judgment. In an appeal from the entry of summary judgment by the Superior Court, the standard of appellate review is not deferential; it is *de novo.* This Court's most complete and authoritative pronouncement regarding the proper standard of appellate review in a summary judgment context was set forth in the following extract from *Merrill v. Crothall–*

---

tion." HCC maintained that such a "determination should await [the damages phase] of this case under the [Superior] Court's various phasing rulings, at which time HCC can and will show that numerous plumbing system claims were 'made in writing.'"

8. These documents were provided to HCC by London during prior discovery.

*American, Inc.*, Del.Supr., 606 A.2d 96, 100 (1992).

Where, as here, appellate review is directed to the granting of summary judgment in the face [of] the non-movant's claim that factual disputes exist, no ... deference is warranted. This Court is thus free to determine, *de novo*, whether the record reflects the existence of material factual disputes.

From an appellate perspective, a decision granting summary judgment over the objection of the non-movant, does not, strictly speaking, present for review "factual findings" but rather presents the legal conclusion that there is no factual bar to the determination of the legal merit of the movant's position. Since that determination is made on a paper record we are free to draw our own inferences as to the legal significance of such evidence. Given the same record, the Court is as institutionally competent to discern the existence of factual disputes as is the trial court.

*Id.* Cf. *Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 650 A.2d 1270 (1994).

### Notice of Claim Issue
### Burden Shifted Improperly

■ London's original motion did not allege that HCC had failed to give the notice required to invoke the seven years of additional coverage. As a result, it was not necessary for HCC to anticipate and rebut a proposition that London did not assert until the filing of its reply brief. Only if London had averred in its original motion and opening brief that the LNO and NOC provisions were not activated would the burden have shifted to HCC to demonstrate the existence of a genuine dispute of material fact on that issue. But cf. *Burkhart v. Davies*, Del.Supr., 602 A.2d 56 (1991).

London's initial motion only asked for a declaration as to the proper interpretation of Insuring Agreement 1. The motion mentioned neither the LNO nor the NOC. Therefore, the Superior Court erred in shifting the burden regarding the factual issue of notice to HCC because London failed to aver, in its original motion, that it had not received the notice required to activate the additional seven years of coverage. Super.Ct.Civ.R. 56.

### HCC's Notice to London
### Material Factual Dispute

■ HCC contends that by giving notice of the plumbing systems claims[9] during the 1988–1989 policy period, it activated the seven years of additional coverage in the LNO and NOC. HCC contends that it gave such notice twice: first, on April 14, 1989, when HCC notified Jardine, Emett & Chandler ("Jardine")[10] of the plumbing systems claims via "Express Mail;" and, second, on April 28, 1989, when HCC sent Jardine a second notice via "Certified Mail." According to HCC, its April 14 and 28, 1989 notices both met the

---

**9.** HCC argues that the Superior Court's Reconsideration Ruling focused solely upon the 1990 Plumbing Claims Summary in the allegedly mistaken belief that HCC had proffered it to show notice during the 1988–1989 policy period:

> 5. In attempting to now support its position with facts, HCC contends that claims were "made in writing" against HCC during the periods specified in the Notice of Circumstance and Loss Notification Option provisions at issue. For example, HCC asserts that it periodically submits plumbing claims summaries to the insurance companies. Specifically, HCC argues that one summary dated August 21, 1990, reveals that HCC was served with complaints through the several years following the end of London's last claims-made period at issue.
>
> 6. However, the 1990 plumbing claims summary offered by HCC does not support its

argument that the Loss Notification Option or Notice of Circumstance provision was triggered. London asserts that the 1990 summary was not submitted during the policy periods at issue and none of the London policies at issue were in effect in 1990. Because neither of the above provisions can be implicated unless the appropriate notification is tendered during the policy period, this argument does not support HCC's assertion. HCC fails to proffer any other facts showing that the policy provisions have been triggered.

According to HCC, the record reflects that it only presented the Plumbing Claims Summary to prove that claims came in during the seven years of additional coverage, in an effort to get the Superior Court to "reconsider" its claims-made trigger ruling.

**10.** Jardine, Emett & Chandler *is the U.S. insur-ance brokerage firm designated to receive notice.*

five notice requirements set forth in both the LNO and NOC provisions.[11]

HCC further contends that London's own documents reflect that HCC had activated the seven-year "tail." In support of its argument, HCC relies upon: first, an April 28, 1989, letter produced by London that stated that a "notice of circumstance [was] just received from Hoechst Celanese with respect to the product Celcon;" second, another document London produced dated May 4, 1989 which requested that the April 28, 1989 letter be amended to read "Loss Notification:"

> Please correct our letter of April 28 regarding Celcon. This is a claim not an incident report as correctly stated in HCC letter of the same date.[12]

and; third, a May 25, 1989 letter which, according to HCC, demonstrates that London's "Leading Underwriter" received HCC's notice: "We acknowledge receipt of your letter dated April 28th 1989, which has been seen by the Leading Underwriter."

The documents HCC produced in arguing for reconsideration by the Superior Court appear to reflect that London did, in fact, receive the HCC notices and recognized them as activating the "tail" coverage. The May 4, 1989 letter also appears to indicate that HCC had activated the additional coverage. On May 25, 1989, London apparently confirmed that the "Leading Underwriter" understood that either the LNO or NOC provision had been activated.

London argues that the question of whether HCC's April 1989 letters activated the "tail" coverage provisions in the claims-made policies is a discrete question of fact. According to London, this Court has no record before it with respect to that question. Therefore, London submits that the question should not be considered for the first time on appeal. *See* Supr.Ct.R. 8. We agree. Similarly, the evidence HCC presented raised a

material factual dispute which precluded the entry of summary judgment in London's favor by the Superior Court. Super.Ct.Civ.R. 56.

In its Claims–Made Trigger Ruling, the Superior Court, *ex mero motu*, found that the London claims-made insurance policies were "negotiated." HCC presented the Superior Court, on reconsideration, with contrary evidence, e.g., HCC's Risk Manager averred that discussions about HCC's policies involved only non-substantive terms and did *not* involve "wordings of form insuring agreements." In addition, Joseph D'Ascoli of Jardine testified that HCC was presented with umbrella and excess standard-form wording that was not negotiated. The Superior Court's Reconsideration Ruling did not address HCC's evidence. The record reflects that the Superior Court's decision regarding negotiation was also precluded by a material factual dispute between the parties.

### Conclusion

When the record evidence is reviewed in the light most favorable to HCC, the non-moving party, it is apparent that there are material facts in dispute. The Superior Court erred in granting summary judgment in favor of London on such a record. The judgments of the Superior Court are REVERSED. This matter is remanded for further proceedings in accordance with this opinion.

---

**11.** According to HCC, to obtain the benefit of the additional LNO and NOC "enhancements" that it purchased, HCC was required to: (i) send notice of a "loss" or "circumstance"; (ii) in writing; (iii) by registered or certified mail; (iv) during the policy period; (v) to Jardine. For purposes of this appeal, this Court has accepted the proposition that differences between the provisions are not material because the notice requirements for both are the same, and both provisions promise seven years of additional coverage.

**12.** Another document produced by London amended the April 28 letter, crossing out "Notice of Circumstance" and writing in by hand "Loss Notification" instead.