Josephine L. WILLIAMS, Plaintiff Below, Appellant,

v.

James A.D. GEIER, Gilbert Geier McCurdy, Daniel J. Meyer, C. Lawson Reed, Joseph A. Steger, Neil A. Armstrong, Edward A. Asplin, Clark Daugherty, Lyle Everingham, and Cincinnati Milacron, Inc., Defendants Below, Appellees.

No. 380, 1994.

Supreme Court of Delaware.

Submitted: Nov. 28, 1995.
Decided: Jan. 23, 1996.

Norman Monhait of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington; William T. Jacobs (argued), of Strauss & Troy, Cincinnati, for appellant.

Martin P. Tully, Richard L. Sutton and Thomas C. Grimm of Morris, Nichols, Arsht & Tunnell, Wilmington; Rory O. Millson (argued), of Cravath, Swaine & Moore, New York City, for appellees.

Before VEASEY, C.J., WALSH and HARTNETT, JJ., HORSEY, J. (Retired), and RIDGELY, President Judge, constituting the Court en Banc.*

VEASEY, Chief Justice, for the majority:

In this appeal, we consider whether defendant below-appellee, Cincinnati Milacron ("Milacron"), may validly implement a recapitalization plan (the "Recapitalization") resulting from an amendment to Milacron's certificate of incorporation (the "Amendment"). The Amendment was recommended by resolution of the Milacron Board of Directors (the "Board") and approved by the requisite stockholder vote. Plaintiff below-appellant, Josephine L. Williams ("Williams"), an individual minority stockholder, brought suit in the Court of Chancery against Milacron and certain members of the Board, challenging the validity of the Amendment and Recapitalization.

The essence of the Recapitalization is to provide for a form of "tenure voting" whereby holders of common stock on the record date would receive ten votes per share. Upon sale or other transfer, however, each share would revert to one-vote-per-share status until that share is held by its owner for three years. The Recapitalization applied to every stockholder, whether a stockholder was a minority stockholder or part of the majority bloc. Williams argues that the Recapitalization disproportionately and invalidly favors stockholders who are part of the majority bloc and disfavors the minority stockholders. Williams further contends that the sole purpose of the Recapitalization was to entrench Milacron management in office and allow the majority bloc to sell a portion of its

---

* This matter was originally heard by a panel of this Court and then was reargued on June 13, 1995 before the Court *en Banc*, consisting of Veasey, Chief Justice, Walsh, Holland and Hartnett, Justices, and Horsey, Justice (Retired), sitting by designation pursuant to Supr.Ct.R. 2 and Del. Const., art. IV, § 38. *Williams v. Geier*, Del.Supr., No. 380, 1994, Walsh, J. (April 13, 1995) (ORDER). Following the June 13, 1995 oral argument, the Court ordered supplemental briefing, *Williams v. Geier*, Del.Supr., No. 380, 1994, Veasey, C.J. (July 7, 1995) (ORDER). On

September 6, 1995, the supplemental briefing was completed and the matter was resubmitted to the Court for decision on the briefs. Thereafter, Justice Holland recused himself and President Judge Ridgely of the Superior Court was designated to sit pursuant to Supr.Ct.R. 2 and Del. Const. art. IV, § 12. With the consent of the parties, the matter was submitted for decision on the briefs, without oral argument, on November 28, 1995. *Williams v. Geier*, Del.Supr., No. 380, 1994, Veasey, C.J. (Nov. 14, 1995) (ORDER),

holdings while retaining control of the company.

The Court of Chancery granted summary judgment in favor of defendants, holding that Milacron's adoption of the Amendment and Recapitalization was valid. Specifically, the court held that *Unocal*[1] applied, and found that the Board had reasonable grounds to believe that a corporate threat existed and that the Recapitalization was a reasonable response to that threat, there being no improper action or motive. In this appeal, Williams claims that the Court of Chancery erred in analyzing the Recapitalization under *Unocal* rather than *Blasius*.[2] Williams also contends that the trial court incorrectly found that the Board satisfied its burden under *Unocal*. Finally, Williams contends that the stockholder vote approving the Amendment does not validate the Amendment or the Recapitalization.

We **AFFIRM** the judgment of the Court of Chancery, but on the following grounds: (1) the instant factual situation implicates neither *Unocal* nor *Blasius*; (2) the business judgment rule applies to the action of the independent majority of the Board in recommending the advisability of the Amendment to the Milacron stockholders; and (3) since a fully informed majority of the stockholders

voted in favor of the Amendment pursuant to the statutory authority of 8 *Del.C.* § 242 ("Section 242"), the stockholder vote is dispositive.

## I. FACTS

Milacron is a Delaware corporation that manufactures machine tools, plastics machinery, computer controls and various other industrial machinery and tools. During the time period relevant to this suit, the Board consisted of ten members—seven independent, disinterested directors [3] who collectively owned less than 1 percent of the common shares outstanding, and three inside directors (deemed not to be independent or disinterested for this purpose) who collectively owned approximately 12.6 percent of the common shares outstanding.[4] With regard to overall share ownership, the Geier family (including the two Geier directors, in-laws and family trusts), together with employee benefit plans owned or controlled in excess of 50 percent of the total voting power of Milacron. We assume, without deciding, therefore, that this group represents a controlling bloc for purposes of this decision.[5] Hence, we will refer to the Geier family and the employees and benefit plans collectively as the "Family Group." [6]

---

1. *Unocal Corp. v. Mesa Petroleum Corp.*, Del. Supr., 493 A.2d 946 (1985).

2. *Blasius Indus., Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988).

3. The seven independent, disinterested directors were: Neil A. Armstrong, Chairman of Computer Technologies for Aviation, Inc. and Director of Thiokol Corp., UAL Corp., USX Corp., as well as other companies; Edward W. Asplin, Chairman and CAO of Bemis Co.; Clark Daugherty, retired past Executive Vice President of Dart Indus.; Lyle Everingham, then Chairman and CEO of the Kroger Co.; Donald N. Frey, Chairman and CEO of Bell & Howell Co.; C. Lawson Reed, retired past Chairman of Xomox Corp.; and Joseph A. Steger, President of the University of Cincinnati.

4. The three inside directors were: James A.D. Geier ("Geier") (then Chairman of the Board and CEO of Milacron, as well as a descendant of Milacron's founder), who owned the largest percentage of shares, holding 9.36% of the common stock outstanding; Gilbert Geier McCurdy ("McCurdy") (another descendant of Milacron's founder), who owned 3.06% of the common shares; and Daniel J. Meyer ("Meyer") (then

Milacron's Executive Vice President of Finance and Administration), who owned 0.17% of the common shares.

5. *But see Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 278, 290–91 (1989) ("*Polaroid II*") (noting that pension plans do not necessarily vote monolithically).

6. According to the Proxy Statement for the April 22, 1986 Annual Meeting:

Current and former employees and Directors, employee benefit plans, descendants of the Company's founder, their in-laws and trusts established by them, own or control in excess of 50% of the total voting power of the Company's stock and in excess of two-thirds of the Preferred Stock outstanding. The trustee for the Company's employee benefit plans, which hold approximately 15% of the total voting power of the Company's stock, has informed the Company that, subject to its fiduciary duties, it currently expects to vote shares with respect to which it has not received instructions from employees in favor of the Recapitalization. All officers and directors as a group (21 persons) beneficially own approxi-

Toward the end of 1985, Meyer determined that it would be in Milacron's best interests to develop a recapitalization plan. With that goal in mind, he pursued talks with the First Boston Corporation ("First Boston"). On December 10, 1985, Meyer, along with Geier and several Milacron officers, met with First Boston and Milacron's outside legal counsel, Cravath, Swaine & Moore ("Cravath"), to communicate Milacron's goals and analyze its options. Another meeting followed on January 8, 1986, at which First Boston identified Milacron's objectives as follows:

- Maintain ability to maximize long-term value for shareholders.
- Provide for ability to meet financing needs of corporation without impairing ability of management to maintain focus on long-term values rather than short-term business cycles.
- Protect long-term commitment to continued growth and investment in machine tool business.
- Reduce level of exposure to raiders seeking to capitalize on corporate vulnerability due to short-term business cycles.
- Continue process of diversification away from primary reliance on machine tool business to mix of 1/3 of revenue and income from machine tools and 2/3 from other sources.
- Provide Board of Directors with a corporate structure which gives the Board the best opportunity to fairly evaluate and negotiate, in the best interests of all shareholders, any proposal to acquire control of the Company.

In light of these goals, First Boston recommended pursuing a "tenure voting plan,"

loosely based on the "Smuckers" [7] recapitalization, whereby all shares would be granted multiple votes which would be lost at transfer and then regained by the transferee after holding the shares for a certain period of time.

Pursuant to First Boston's recommendation, Article Fourth of Milacron's Restated Certificate of Incorporation would be amended so that all stockholders owning common stock on the effective date would be entitled to ten votes per share. Upon sale or other transfer of ownership, the voting rights of each share would revert to a single vote per share until such time as the new stockholder held the share for thirty-six consecutive months. If Milacron issued new shares after the effective date, these shares would be treated the same as pre-Recapitalization shares that had been sold or transferred—they would be entitled to only one vote until held for thirty-six consecutive months by the same stockholder. Milacron's officers ultimately decided to pursue the Recapitalization and instructed First Boston to prepare a presentation to be made to the Board.

On January 24, 1986, Milacron management and First Boston presented the Recapitalization to the Board at a special board meeting.[8] First Boston provided the directors with detailed materials focusing on the benefits long-term investors would realize under the Recapitalization, as well as analyses of several other possible recapitalization plans. The Board decided to postpone action concerning the Recapitalization, and agreed to discuss the subject further at its next meeting on February 11, 1986. On March 21, 1986, the Board ultimately

mately 14% of the total voting power of the Company's stock and are expected to vote in favor of the Recapitalization. Although the Company has not solicited the views of shareholders, it is also expected that most descendants of the Company's founder and their in-laws will vote shares of the Common Stock and Preferred Stock owned or controlled by them in favor of the Recapitalization. Accordingly, approval of the Recapitalization at the meeting is virtually assured.

Cincinnati Milacron, Inc. Proxy Statement 21 (Mar. 24, 1986) (the "Proxy").

**7.** The J.M. Smucker Company stockholders adopted a provision whereby existing stockhold-

ers would receive ten votes for each share held. These shares would revert to one-vote-per-share status upon transfer and would regain super-voting status only after being held for forty-eight consecutive months. J.M. Smucker Co. Proxy Statement 10–12 (July 25, 1985); *see* A.A. Sommer, Jr., *Two Classes of Common Stock and Other Corporate Governance Issues* 1985 (PLI Corp. Law & Practice Course Handbook Series No. 498, 1985) (analyzing the policy behind stock exchange voting rules and the interaction of various forms of recapitalization with those rules).

**8.** All directors attended the meeting except Neil A. Armstrong.

adopted a resolution proposing the Amendment and Recapitalization, determining that the Amendment and Recapitalization are "in the best interests of the Company and its shareholders" and recommending a favorable vote by stockholders at the April 22, 1986 Annual Meeting.

Pursuant to 8 *Del.C.* § 242(b)(1), effectuation of the Amendment required both the Board resolution recommending advisability and approval by the affirmative vote of a majority of the outstanding stock entitled to vote thereon.[9] Accordingly, Milacron sent to stockholders a Notice of Annual Meeting of Shareholders and accompanying Proxy Statement for the April 22, 1986 meeting. The Proxy Statement (the "Proxy") explained that the Board believed the Recapitalization was in the best interests of the stockholders and had the threefold effect of: (1) providing existing and long-term stockholders with a greater voice in the company; (2) permitting issuance of additional shares of common stock with minimal dilution of voting rights; and (3) discouraging hostile takeovers.

In addition to informing the stockholders of the benefits of the Recapitalization, the Proxy also informed them of possible disadvantages:

(1) if passed, the Recapitalization would "concentrate voting power in the hands of long-term shareholders" including the "descendants of the Company's founder, their in-laws and trusts established by them," Proxy at 16–17; [10]

(2) "the Recapitalization may make [Milacron] a less attractive target for a takeover bid or share accumulation ..." and, as a result, "approval of the Recapitalization may deprive shareholders of an opportunity to sell their shares at a price higher than that prevailing in the market ...," Proxy at 15–16;

**9.** 8 *Del.C.* § 242(b)(1) provides, in pertinent part:

(b) Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:

(1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a special meeting of the stockholders entitled to vote in respect thereof for the consideration of such amendment or directing that the amendment proposed be considered at the next annual meeting of the stockholders....

... If a majority of the outstanding stock entitled to vote thereon, and a majority of the outstanding stock of each class entitled to vote thereon as a class has been voted in favor of the amendment, a certificate setting forth the amendment and certifying that such amendment has been duly adopted in accordance with this section shall be executed, acknowledged, filed and recorded, and shall become effective in accordance with § 103 of this title.

**10.** Prior to the Recapitalization, the Family Group held over 50% of the outstanding Milacron shares, making it Milacron's controlling stockholder bloc. First Boston prepared an analysis of the relative control the Family Group could expect to exert under the Recapitalization. Assuming 30% of the minority shares were sold, the Family Group would control anywhere from 51.9% if they sold 30% of their own shares, to 59.1% if they held on to all of their shares for a period of three years. Their control would become even greater in the event of a mass minority share sell-off, such as in a hostile tender offer. For example, in a scenario where 70% of the minority shares are sold, the Family Group will control anywhere from 67.3% if they sell 30% of their own holdings, to 73.9% if they do not sell their own shares for a period of three years. Thus, the Recapitalization strengthened the Family Group's "veto" power over any proposed sale of Milacron, and perpetuated the Family Group's control over the election of future directors, even after substantial reduction of Family Group share holdings.

At oral argument, Williams' counsel suggested that the Recapitalization had an immediate dilutive effect upon outside stockholders' voting power. This assertion was based on the fact that all shares held in street name were presumed to be short-term, possessing one vote. Under the terms of the Recapitalization, however, this presumption was rebuttable. By demonstrating that a particular beneficial owner was, in fact, a long-term holder, the shares held in street name would be given full, super-voting power. Thus, any dilution of outside stockholders' voting power came as a result of the inaction of those stockholders. The Family Group did not exercise control over whether the beneficial owners of the shares held in street name would seek to rebut the presumption and attain super-voting status. This was merely an incidental effect, brought about by the logistics of the transaction. Thus, this incidental impact cannot be seen as a non-pro rata or disproportionate benefit accruing to the Family Group. The failure of beneficial owners of shares held in street name to assert their super-voting status increased the relative voting power of all long-term holders, not just the Family Group.

(3) "[i]f the Recapitalization is approved by the shareholders, the same shareholders who voted to approve the Recapitalization may have insufficient voting power to amend or repeal the Recapitalization at a future date," Proxy at 17; and

(4) if the Recapitalization is approved by less than a 66.7 percent majority, Milacron is likely to be delisted from the New York Stock Exchange ("NYSE"), Proxy at 17–18.

As noted, the Proxy also informed the stockholders that the Family Group owned or controlled in excess of 50 percent of the total voting power, and that, accordingly, "approval of the Recapitalization at the meeting is virtually assured," Proxy at 21.[11]

Over 72 percent of the outstanding common stock voted in favor of the Amendment. Assuming all the common stock held by the Family Group voted in favor, of the remaining (presumed unaffiliated) shares present or represented by proxy, approximately 5,858,777 voted in favor and 3,103,608 voted against or abstained. An additional 3,302,759 shares of common stock were not represented at the meeting. This means that there were approximately 6,406,367 presumed unaffiliated common shares that did not vote in person or by proxy or did not vote in favor, compared with approximately 5,858,777 which did vote in favor. Therefore, construing the record most favorably for Williams,

the Amendment received less than 50 percent of the votes of all the unaffiliated shares outstanding.[12]

## II. PROCEDURAL HISTORY IN COURT OF CHANCERY

In April 1986, Williams challenged the Recapitalization by bringing suit against Milacron and nine of its directors (collectively, the "Defendants").[13] Williams' complaint purported to state five separate claims as follows: (1) the sole purpose of the Recapitalization was to entrench Milacron management in office and allow the Family Group to liquidate a portion of its holdings while retaining control of the company; (2) the Recapitalization impermissibly creates disparate voting rights within a single class of stock in contravention of established principles of Delaware law; (3) the Recapitalization impermissibly restricts the transferability of Milacron common stock since the transferee may not exercise the full voting power of her shares for a period of three years; (4) the Proxy failed to disclose facts material to a Milacron stockholder's determination of the merits of the Recapitalization; and (5) the Board impermissibly coerced Milacron stockholders into voting for the Recapitalization and thereby breached their fiduciary duties.

Defendants then filed a motion to dismiss the complaint which was granted in part and denied in part. In a Memorandum Opinion

---

11. See supra n. 6.

12. According to the Proxy, the Geier family (including trusts) owned or controlled approximately 35% of the shares of common stock and approximately 44% of the shares of preferred stock, or approximately 36% of the total voting power of the Company's stock. In addition, approximately 15% of the common stock and 37% of the preferred stock (or 16% of the total voting power of the Company) was owned or controlled by plans for the benefit of employees and by current or former employees other than descendants of the Company's founder. The record as to the vote is unclear and requires some interpolation. The Secretary certified that there were 23,538,326 common shares outstanding, of which 20,235,567 shares were represented at the meeting and voted, leaving 3,302,759 outstanding shares which were not represented at the meeting; 17,131.959 voted in favor; 3,103,608 voted against

or abstained; members of the family and family trusts voted 7,507,050 in favor; there were 9,624,909 additional votes in favor. This is all the information provided in the Secretary's certificate. We must interpolate the following: Perhaps as much as, but not more than 3,766,132 (16%) of the outstanding common shares are presumed to be held by benefit plans and former employees and are presumed to have voted in favor. This leaves at least 5,858,777 unaffiliated common shares voting in favor as compared to 3,103,608 voting against or abstaining and 3,302,759 which were not represented at the meeting, totalling 6,406,367 presumed unaffiliated common shares which did not vote in favor. The record does not show that the preferred vote is relevant for this purpose.

13. Williams did not include Donald N. Frey in her suit.

dated May 20, 1987,[14] the Court of Chancery permitted Williams to pursue her claim that, in recommending the Recapitalization, Milacron management was motivated solely by a desire to entrench itself in office. The related claim, that the Recapitalization was designed to allow the Family Group to liquidate a portion of its holdings and still retain control of Milacron, was also allowed to proceed. Three of the four remaining claims, including allegations of impermissible creation of disparate voting rights within a single class of stock, improper restrictions on stock transferability and disclosure violations, were dismissed by the court. Williams' remaining claim of substantive coercion was voluntarily dismissed.[15]

After discovery was nearly complete, Williams moved for partial summary judgment as to liability. Defendants cross-moved for summary judgment. The Court of Chancery, in an order dated September 9, 1994, denied Williams' motion, but granted Defendants' cross-motion. Analyzing the facts under *Unocal Corp. v. Mesa Petroleum,* Del. Supr., 493 A.2d 946 (1985), the trial court found that the Recapitalization was a reasonable defensive measure in light of the undisputed evidence that the Board carefully considered the Company's long-term needs and its potential vulnerability, concluding:

> Although plaintiff argues that the real purpose of the recapitalization plan was to allow the Family Group to liquidate some of its holdings without losing voting control, the evidence, viewed in the light most favorable to plaintiff, does not support this claim. It is true that long-term investors, including the Family Group, will be able to maintain their voting power even if they sell some of their stock. However, the fact that a plan has an entrenchment effect does not mean that it was so motivated. The undisputed evidence establishes that the directors were motivated by the good

faith belief that long term corporate planning would be enhanced by the recapitalization plan. Plaintiff's reliance on post-recapitalization stock sales as evidence of improper motivation, also is misplaced. The evidence establishes that those stock sales were unrelated to the adoption of the plan. In particular, Geier stated that tax reasons forced the liquidation of a large portion of his deceased parents' estate including most of its Milacron holdings.

*Williams v. Geier,* Del.Ch., C.A. No. 8456, at 7, 1994 WL 514871, *3 (Sept. 9, 1994) (ORDER).

## III. SCOPE OF APPELLATE REVIEW

■■■ To discharge its appellate function on review of the trial court's entry of summary judgment, this Court must determine "whether the record shows that there is no genuine, material issue of fact and the moving party is entitled to judgment as a matter of law." *Arnold v. Society for Sav. Bancorp,* Del.Supr., 650 A.2d 1270, 1276 (1994). Our review of the trial court's determinations in this context is *de novo,* not deferential, both as to the facts and the law. On a summary judgment record (which is essentially a paper record not involving credibility assessments), we are free to draw our own inferences in making factual determinations and in evaluating the legal significance of the evidence because this Court "is as institutionally competent to discern the existence of factual disputes as is the trial court." *Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's, London,* Del.Supr., 656 A.2d 1094, 1099 (1995) (quoting *Merrill v. Crothall–American, Inc.,* Del.Supr., 606 A.2d 96, 100 (1992)). The facts of record, including any reasonable hypotheses or inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party (which is deemed to be Williams for purposes

14. *Williams v. Geier,* Del.Ch., C.A. No. 8456, 1987 WL 11285, mem. op. (May 20, 1987).

15. In this appeal, Williams raises allegations of improper coercion to support her contention that the stockholder vote should be deemed null and void. Defendants point to the fact that Williams voluntarily dismissed this claim at an earlier stage of the litigation, and argue that this conten-

tion should not be reached by the Court on appeal. In essence, Defendants contend that Williams has waived the right to argue that improper coercion infected the electoral process. We conclude otherwise—namely that the question of improper coercion is an issue properly before us in analyzing the validity of the stockholder approval of the Amendment.

of this appeal). *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 844 (1987).

## IV. INAPPLICABILITY OF *UNOCAL* AND *BLASIUS*

Williams begins her attack on the grant of summary judgment by questioning the trial court's choice of the "more lenient standard of *Unocal*" to review the Board's actions, rather than the "heightened standard of scrutiny" used in *Blasius Industries v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988). We hold that neither standard is implicated here because there was no unilateral board action. Here, there was stockholder approval of the Amendment. Accordingly, the Board action was not unilateral. The Board recommended that stockholders vote in favor of the Amendment. We must examine, therefore, both the Board action and the validity of the stockholder approval.

In *Blasius*, Blasius Industries ("Blasius"), the owner of a substantial block of Atlas Corporation ("Atlas") common stock, initiated a consent solicitation seeking to amend the Atlas bylaws to expand the size of the Atlas board from seven to fifteen members. *Blasius*, 564 A.2d at 652. The Atlas board of directors, in an attempt to preempt the consent solicitation, immediately and unilaterally expanded the size of the board to nine members and filled the new directorships with its own nominees. Blasius brought an action challenging the validity of Atlas' action. The Court of Chancery held that "when [a board] acts ... for the primary purpose of preventing or impeding an unaffiliated majority of shareholders from expanding the board and electing a new majority," its action "constitute[s] an offense to the relationship between corporate directors and shareholders that has traditionally been protected...." *Blasius*, 564 A.2d at 652. Such disenfranchising

actions are not, however, invalid *per se.* "Rather, ... in such a case, the board bears the heavy burden of demonstrating a compelling justification for such action." *Blasius*, 564 A.2d at 661.[16]

■ *Blasius*' burden of demonstrating a "compelling justification" is quite onerous, and is therefore applied rarely. As this Court noted in *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 92 (1992) (*"Stroud II"*), the application of the "compelling justification" standard set forth in *Blasius* is appropriate only where the "'primary purpose' of the board's action [is] to interfere with or impede exercise of the shareholder franchise," and the stockholders are not given a "full and fair opportunity to vote."

■ We can find no evidence to support Williams' claim that the Defendants' primary purpose in adopting the Recapitalization was a desire to impede the Milacron stockholders' vote. The record does not rebut the business judgment rule presumption that the Board acted independently, with due care, in good faith and in the honest belief that its actions were in the stockholders' best interests. *See Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). According to the Proxy, the directors were motivated by a desire to:

> promote long-term planning and values by enhancement of voting rights of long-term shareholders ...[;] permit the issuance of additional shares of common stock for financing or other purposes with minimal dilution of voting rights of long-term shareholders ...[; and] discourage hostile takeovers and put the Board of Directors in the best position to represent the interests of all shareholders.

Proxy at 14. Plaintiff has submitted no evidence to the contrary.[17]

---

**16.** The Court of Chancery's holding in that case—that a corporate board violates Delaware law when it deliberately acts to frustrate or disenfranchise a stockholder electorate, *Blasius*, 564 A.2d at 661—has been cited with approval by this Court in other contexts. *See, e.g., Unitrin Inc. v. American Gen. Corp.*, Del.Supr., 651 A.2d 1361, 1378–79 (1995); *Preston v. Allison*, Del. Supr., 650 A.2d 646, 649 (1994); *Paramount Communications Inc. v. QVC Network Inc.*, Del. Supr., 637 A.2d 34, 42 n. 11 (1994) (*"QVC Net-*

work*"*); *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 78–79, 91 (1992) (*"Stroud II"*); *Centaur Partners IV v. National Intergroup, Inc.*, Del.Supr., 582 A.2d 923, 927 (1990).

**17.** The only evidence that Williams points to regarding a desire to impede the stockholder vote are First Boston's presentation materials that identify the Family Group's voting power under different scenarios, and a statement by Geier that he did not want the family to sell its shares. An

A *Unocal* analysis should be used only when a board unilaterally (*i.e.*, without stockholder approval) adopts defensive measures in reaction to a perceived threat. *Unocal*, 493 A.2d at 954–55. *Unocal* is a landmark innovation of the dynamic takeover era of the 1980s.[18] It has stood the test of time, and was recently explicated by this Court in *Unitrin, Inc. v. American General Corp.*, Del.Supr., 651 A.2d 1361 (1995). Yet, it is inapplicable here because there was no unilateral board action.

The Court of Chancery did, however, apply a *Unocal* analysis here, finding that a threat to corporate policy and effectiveness existed and that the Recapitalization was a reasonable response to that threat. Specifically, the Court of Chancery found that:

> Milacron's directors were interested in long-term planning and, given the cyclical nature of Milacron's business, they were concerned that the company would be vulnerable during short-term market fluctuations. The reasonableness of the Recapitalization Plan as a defensive measure is established by the fact that the plan achieves Milacron's goals without preventing any stockholder from becoming a long-term stockholder and, thus, obtaining the super voting power.

investment banking firm examining recapitalization options normally would include in its analysis a description of how shares, particularly controlling shares, are affected under various plans. Thus, Williams' reliance on the First Boston data is unpersuasive.

**18.** Central to the *Unocal* jurisprudence is the following: When a board unilaterally adopts defensive measures, there is the "omnipresent specter" of the inherent conflict between the board's duty to stockholders and the board's possible self-interest. That danger requires that the business judgment rule be applied only after the board's actions pass an intermediate level of enhanced judicial scrutiny which implicates the board's burden of going forward with the evidence before the burden may shift back to the plaintiffs for the ultimate burden of persuasion. *Unocal*, 493 A.2d at 954–55. *Unocal* requires that the court evaluate whether, in undertaking its unilateral defensive action: (1) the board "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed"; and (2) the board's response was reasonable in relation to the threat posed. *Unocal*, 493 A.2d at 955. The fact that no company or person has commenced a specific takeover threat or action at the time of the defensive measure's

*Williams v. Geier*, Del.Ch., C.A. No. 8456, at 6–7, 1994 WL 514871, *3 (Sept. 9, 1994) (ORDER).

The instant case does not involve either unilateral director action in the face of a claimed threat or an act of disenfranchisement. Rather, the instant case implicates the traditional review of disinterested and independent[19] director action in recommending, and the vote of the stockholders in approving, the Amendment and the resulting Recapitalization. Thus, neither *Blasius* nor *Unocal* applies. The Court of Chancery's finding does, however, support the conclusion that the director and stockholder action which effectuated the Recapitalization here "can be attributed to [a] ... rational business purpose." *See Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971).

## V. STANDARD OF JUDICIAL REVIEW OF BOARD ACTION RECOMMENDING THE AMENDMENT TO THE STOCKHOLDERS

The Board's action in recommending the Recapitalization to the stockholders pursuant to Section 242(b)(1) is protected by the presumption of the business judgment rule

adoption does not preclude application of the *Unocal* analysis if it is otherwise applicable. *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346, 1350 (1985).

**19.** This Court has defined "disinterested directors" as those directors that "neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984) (citing *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971); *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554 (1964); *David J. Greene & Co. v. Dunhill Int'l, Inc.*, Del.Ch., 249 A.2d 427, 430 (1968)); *see also* 8 *Del.C.* § 144. Likewise, "independent" means that a "director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. Williams has not presented any evidence rebutting the presumption that the majority of the Board was disinterested and independent. See text accompanying n. 3, *supra*.

unless that presumption is rebutted.[20] *See Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140, 1151–52 (1990) (finding that the strategic decision of Time's board, after an exhaustive appraisal of Time's future, was entitled to the protection of the business judgment rule); *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 624–25, 627 (1984) (finding business judgment presumption not rebutted in context of board's rejection of unsolicited tender offer); *TW Servs., Inc. v. SWT Acquisition Corp.*, Del.Ch., C.A. Nos. 10427, 10298, 1989 WL 20290, *11, mem. op. at 34, Allen, C. (Mar. 2, 1989) (holding that board's decision not to agree to an invitation to merge was a statutory prerogative of the board under 8 *Del.C.* § 251, and therefore protected by the business judgment rule).

■■■ Williams contends that the action of the Board in recommending the Amendment and Recapitalization to the stockholders constituted either a breach of fiduciary duty or an impermissible effort at entrenchment, both of which are claimed to rebut the business judgment presumption and implicate entire fairness review. We disagree. These contentions are conclusory and have no factual support in this record.

There was on this record: (1) no non-pro rata or disproportionate benefit which accrued to the Family Group on the face of the Recapitalization, although the dynamics of how the Plan would work in practice had the effect of strengthening the Family Group's control;[21] (2) no evidence adduced to show that a majority of the Board was interested or acted for purposes of entrenching themselves in office; (3) no evidence offered to show that the Board was dominated or controlled by the Family Group;[22] and (4) no violation of fiduciary duty by the Board.

Only by demonstrating that the Board breached its fiduciary duties may the presumption of the business judgment rule be rebutted, thereby shifting the burden to the Board to demonstrate that the transaction complained of was entirely fair to the stockholders. *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1164 (1995) (*"Technicolor"*); *Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638 A.2d 1110, 1115–17 (1994); *Nixon v. Blackwell*, Del.Supr., 626 A.2d 1366, 1375–76 (1993); *see also Aronson*, 473 A.2d at 812 (noting that business judgment rule is inapposite to demand futility analysis if directors breach their fiduciary duties).

Based on the undisputed evidence in this record, we conclude that the Board's action in recommending the Amendment and Recapitalization to the stockholders for approval, pursuant to 8 *Del.C.* § 242(b)(1), is protected by the business judgment rule. We

**20.** If and when the presumption is rebutted, the matter proceeds to an analysis of entire fairness, which in turn implicates fair price and fair dealing. Otherwise, an entire fairness analysis is not implicated. In such an entire fairness proceeding, the defendant directors have the burden of proof. *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1162 (1995) (*"Technicolor"*); *Unitrin*, 651 A.2d at 1371–75; *Kahn v. Lynch Communication Sys., Inc.*, Del.Supr., 638 A.2d 1110, 1115–17 (1994); *QVC Network*, 637 A.2d at 42 n. 9; *Nixon v. Blackwell*, Del.Supr., 626 A.2d 1366, 1375–76 (1993).

**21.** *See* n. 10 *supra* and the accompanying text for an analysis of the effects of the Recapitalization. In support of its assertion that the Recapitalization disproportionately favors the Family Group, the dissent erroneously suggests that the Recapitalization allows Family Group members to transfer shares among themselves without losing super-voting status. *See infra* at n. 40. As the Proxy reveals, however, no special dispensation is given to Family Group members. Rather, the Recapitalization excludes certain types of transfers from its purview. For example, transfers pursuant to divorce, bequest or gift are deemed not to interrupt the previous owner's tenure, and do not, therefore, cause a diminution in the voting power of the shares transferred. Proxy at 13. The Recapitalization does allow the transfer of shares among Milacron's employee benefit plans without penalty. This is not, however, tantamount to an exclusion of Family Group shares from the effects of the Recapitalization.

**22.** The mere fact that the Family Group owned a dominant stock interest does not rebut the presumption of the business judgment rule or call the directors' independence into question. *See Puma v. Marriott*, Del.Ch., 283 A.2d 693 (1971) (where five of nine directors were independent, board approval of transaction with 46% stockholder bloc held governed by the business judgment rule). If domination and control by a majority stockholder is not alleged by particularized facts and supported by evidence, the presumption of independence is intact. *See Aronson*, 473 A.2d at 816–17. That is this case.

now turn to the issue of the validity of the stockholder vote.

## VI. THE EFFECT OF THE STOCK-HOLDER VOTE

### A. General

The recommendation by a board of directors of the advisability of a charter amendment is merely the first step under the organic, statutory scheme of 8 *Del.C.* § 242, which authorizes amendments to certificates of incorporation. The second step—the stockholder vote pursuant to which an amendment is approved—must be examined for compliance with the statute, the adequacy of the disclosures advanced to secure the stockholder approval, and compliance with fiduciary duty. In such a situation, "our standard of review is linked to the validity of the shareholder vote." *Stroud II*, 606 A.2d at 83.

 Stockholder approval of an organic, statutory change must comply with the statutory procedure and must be based on full and fair disclosure. The burden rests on the party relying on stockholder approval to establish that the approval resulted from a fully informed electorate and that all material facts relevant to the transaction were fully disclosed. *See Yiannatsis v. Stephanis*, Del. Supr., 653 A.2d 275, 280 (1995); *Bershad*, 535 A.2d at 846; *Smith v. Van Gorkom*, Del.

Supr., 488 A.2d 858, 893 (1985); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 703 (1983); *see also Michelson v. Duncan*, Del. Supr., 407 A.2d 211, 224 (1979); *Gottlieb v. Heyden Chem. Corp.*, Del.Supr., 91 A.2d 57, 58–59 (1952); *Saxe v. Brady*, Del.Ch., 184 A.2d 602, 610 (1962); *Gerlach v. Gillam*, Del.Ch., 139 A.2d 591, 593 (1958).

We put to one side those cases, not relevant here, where stockholders are called upon to ratify action which may involve a transaction with an interested director or where the transaction approved by the board may otherwise be voidable.[23] *See, e.g., Marciano v. Nakash*, Del.Supr., 535 A.2d 400, 403–04 (1987); *Van Gorkom*, 488 A.2d at 889–90; *Michelson*, 407 A.2d at 218–220.

Our analysis here involves an entirely different application of the Delaware General Corporation Law—namely, the effect of corporate action which, in order to become operative, requires and receives both approval by the board of directors and the stockholders. Three examples are common: amendments to the certificate of incorporation (8 *Del.C.* § 242); mergers or consolidations of domestic corporations (8 *Del.C.* § 251); and sales of all or substantially all of a corporation's assets (8 *Del.C.* § 271, which permits a sequence that may vary from the sequences applicable to amendments or mergers).[24] There are, of course, other examples.

---

**23.** Transactions which are *voidable*, as distinct from those which are *void*, may in some circumstances, be ratified.

The key to upholding an interested transaction is the approval of some neutral decision-making body. Under 8 *Del.C.* § 144, a transaction will be sheltered from shareholder challenge if approved by either a committee of independent directors, the shareholders, or the courts. *Oberly v. Kirby*, Del.Supr., 592 A.2d 445, 467 (1991); *Technicolor*, 663 A.2d at 1170; *see also In re Wheelabrator Technologies, Inc. Shareholders Litig.*, Del.Ch., 663 A.2d 1194, 1202 (1995) (noting some such circumstances and concluding that stockholder ratification may not extinguish a "duty of loyalty claim"); *cf. In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 67 (1995) (holding that stockholder approval of merger did not ratify board's use of defensive measures to thwart hostile bidder). We express no opinion on the question whether a "duty of loyalty claim" may or may not be ratified. Delaware law relating to the approval of interested director transactions and ratification principles

may differ in certain respects from that advanced in 1 American Law Inst., *Principles of Corporate Governance* pt. 5, § 5.01 *et seq.*, at 199–382 (1994). *See* John F. Johnston and Frederick H. Alexander, *The Effect of Disinterested Director Approval of Conflict Transactions under the ALI Corporate Governance Project—A Practitioner's Perspective*, 48 Bus.Law. 1393 (1993); *see also* Charles Hansen, *A Guide to the American Law Institute Corporate Governance Project*, 43–55 (1995).

**24.** The term "ratification" is, in the dictionary sense, a generic term connoting official approval, confirmation or sanction. *See Random House Unabridged Dictionary* 1602 (2d Ed.1993). Thus, it is not incorrect to consider broadly that stockholder approval in either sense may be called "ratification." But where the organic act (such as those occurring under Section 242) necessarily requires stockholder approval for its effectuation, it may be preferable to employ the statutory usage—*viz.*, "vote in favor" or, simply, stockholder approval.

*Stroud II,* 606 A.2d 75, provides a useful example of the type of analysis required of this Court when presented with this type of organic, statutory change. In *Stroud II,* the board of Milliken Enterprises ("Milliken"), a privately held Delaware corporation, recommended to its stockholders that the certificate of incorporation be amended in certain respects and that certain bylaw amendments be approved.[25] The minority-stockholder plaintiffs alleged that the amendments were defensive, served no legitimate purpose, were designed to entrench the majority, and were, therefore, invalid under *Unocal.* Plaintiffs in *Stroud II* further contested the accuracy and adequacy of the disclosures made to the stockholders in connection with the vote at the stockholders' meeting.

In *Stroud II,* this Court first determined that the directors' actions in recommending to the stockholders the charter and bylaw amendments were protected by the business judgment rule and that *Unocal* was inapplicable. *Id.,* 606 A.2d at 82–83. Since the majority of the stockholders entitled to vote approved the changes, the issue confronting this Court was whether the stockholder vote was effective. While 78 percent of the shares entitled to vote approved the changes, the vast majority of these shares were controlled by four members of Milliken's board of directors. Turning to the validity of the stockholder vote, the Court concluded:

> In the absence of proof by plaintiffs that the disclosures were misleading or inadequate, or that the actions of the board involved fraud, waste or other misconduct

which were not ratified by unanimous vote of the stockholders, *this ends the matter.* *See, e.g., Keenan v. Eshleman,* Del.Supr., 2 A.2d 904, 909 (1938).

*Stroud II,* 606 A.2d at 84 (emphasis supplied) (footnote omitted).

> In sum, after finding that the shareholder vote was fully informed, and in the absence of any fraud, waste, manipulative or other inequitable conduct, *that should have ended the matter on basic principles of ratification.*

*Id.,* 606 A.2d at 92 (emphasis supplied) (citation omitted).

## B. Applicability of Existing Law to this Case

We find that *Stroud II* is applicable here. In *Stroud II,* this Court held that the stockholder vote, being both fully informed and devoid of any fraud, waste, manipulative or other inequitable conduct, effectively implemented the board recommendations adopting amendments to the certificate of incorporation and approving a bylaw change, both of which allegedly benefited the incumbent controlling majority. *Stroud II,* 606 A.2d at 83. The presence of a controlling majority stockholder did not undermine the validity of the stockholder vote.

■ In the instant case, like *Stroud II,* the Board recommended the advisability of the Amendment to the stockholders who voted in favor of the Amendment. On its face, therefore, the corporate action was authorized and regular.[26] Stockholders (even a

---

**25.** As we explained in *Stroud II,* 606 A.2d at 80:

The most controversial aspects of the Amendments are charter Article Eleventh (c) and By-law 3. Article Eleventh (c) established a new method of qualifying directors for membership on Milliken's board. By-law 3 established the procedure for nominating board candidates. By-law 3 required the shareholders to submit a notice of their candidates to the board, specifying their qualifications under Article Eleventh (c), well in advance of the annual meeting. By-law 3 also empowered the board to disqualify a shareholder's nominee at any time even at the annual meeting.

**26.** 8 *Del.C.* § 242 is very broad in its authority:

[A] corporation may amend its certificate of incorporation, from time to time, so as:

(1) To change its corporate name; or

(2) To change, substitute, enlarge or diminish the nature of its business or its corporate powers and purposes; or

(3) To increase or decrease its authorized capital stock or to reclassify the same, by changing the number, par value, designations, preferences, or relative, participating, optional, or other special rights of the shares, or the qualifications, limitations or restrictions of such rights, or by changing shares with par value into shares without par value, or shares without par value into shares with par value either with or without increasing or decreasing the number of shares; or

(4) To cancel or otherwise affect the right of the holders of the shares of any class to receive dividends which have accrued but have not been declared; or

controlling stockholder bloc) may properly vote in their own economic interest, and majority stockholders are not to be disenfranchised because they may reap a benefit from corporate action which is regular on its face. As we stated in *Stroud II*:

> The fact that controlling shareholders voted in favor of the transaction is irrelevant as long as they did not breach their fiduciary duties to the minority holders. *Unocal*, 493 A.2d at 958; *Bershad*, 535 A.2d at 845; *see Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Ringling*, Del. Supr., 53 A.2d 441, 447 (1947).

*Stroud II*, 606 A.2d at 83–84.

The result here, as in *Stroud II*, is entirely in harmony with the broad policies underlying the Delaware General Corporation Law. At its core, the Delaware General Corporation Law is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored. Although directors are given much discretion in managing the business and affairs of the corporation,[27] some fundamental measures require stockholder action. For example, when the statutory framework was altered in 1986 to permit some exemptions from personal liability for directors in 8 *Del.C.* § 102(b)(7), it was (and is) the legislative policy of this State that such exemptions could be enjoyed by directors only if stockholders approved such a provision in the certificate of incorporation. Further, all amendments to certificates of incorporation and mergers require stockholder action. Thus, Delaware's legislative policy is to look to the will of the stockholders in these areas.

Like the statutory scheme relating to mergers under 8 *Del.C.* § 251, it is significant that two discrete corporate events must occur, in precise sequence, to amend the certificate of incorporation under 8 *Del.C.* § 242: First, the board of directors must adopt a resolution declaring the advisability of the amendment and calling for a stockholder vote. Second, a majority of the outstanding stock entitled to vote must vote in favor. The stockholders may not act without prior board action. Likewise, the board may not act unilaterally without stockholder approval. Therefore, the stockholders control their own destiny through informed voting. This is the highest and best form of corporate democracy.[28]

### C. No "Majority of Minority" Vote Required

In support of her claim that the stockholder vote is ineffective, Williams points to *Fliegler v. Lawrence*, Del.Supr., 361 A.2d 218 (1976), a case in which this Court held that a stockholder vote to validate an interested director transaction under 8 *Del.C.* § 144 requires that the approval must come from a majority of the disinterested stockholders. Clearly, *Fliegler* does not apply here where there was an independent board and no interested director transaction.[29]

---

(5) To create new classes of stock having rights and preferences either prior and superior or subordinate and inferior to the stock of any class then authorized, whether issued or unissued; or

(6) To change the period of its duration.

The Amendment here clearly fits within that authority.

**27.** *See* 8 *Del.C.* § 141(a); *Moran*, 500 A.2d at 1353; *Unocal*, 493 A.2d at 953.

**28.** Absent fraud, waste, manipulative or inequitable conduct or other breach of fiduciary duty, a majority stockholder block, like the Family Group here, has broad legitimate powers. Of course, the corporate action must have a rational corporate purpose, *Sinclair*, 280 A.2d at 720, and may not be taken for the sole or primary purpose of entrenchment. *Johnson v. Trueblood*, 3rd Cir.,

629 F.2d 287, 293 (1980). As we noted in *QVC Network*, 637 A.2d at 42–43, a controlling stockholder has the power, absent violation of fiduciary duty, to cause a cash-out merger, cause a break-up of the company, merge with another company, sell substantially all the corporate assets, etc. *See also Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 845 (1987); *Unocal*, 493 A.2d at 958.

**29.** The statutory scheme in *Fliegler* was based upon 8 *Del.C.* § 144—the interested director transaction statute. In the case at bar, an entirely different statutory scheme is involved—namely, an amendment to the certificate of incorporation under 8 *Del.C.* § 242. Those are two statutory frameworks of independent legal significance. *See Orzeck v. Englehart*, Del.Supr., 195 A.2d 375, 377 (1963); *Heilbrunn v. Sun Chemical Corp.*, Del.Supr., 150 A.2d 755, 757–59 (1959).

There is no requirement under the Delaware General Corporation Law that a majority of the outstanding minority shares must vote in favor of a transaction which benefits the majority. The issue of the role of a "majority of the minority" vote must be clearly understood. Where, as here, there is a controlling stockholder or a controlling bloc, there is no requirement under the Delaware General Corporation Law that the transaction be structured or conditioned so as to require an affirmative vote of a majority of the minority group of outstanding shares. *See Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 937 (1985). In those parent-subsidiary situations where the circumstances call for an entire fairness analysis, the burden is normally on the defendants to show entire fairness, but if a majority of the minority votes in favor under certain circumstances, the burden shifts to the plaintiff to show unfairness. *Id.; see also Kahn,* 638 A.2d at 1116–17. The converse does not apply, however—namely, the failure to obtain a majority of the minority does not give rise to any adverse inference of invalidity. Moreover, in a case such as the case at bar where entire fairness is not an issue, the question of whether a majority of the minority was obtained is simply irrelevant.

### D. Alleged Improper "Coercion"

Williams claims that the stockholder vote was rendered null and void because the vote was improperly coerced and the majority of stockholders voting to approve the Amendment were members of the Family Group. Williams' claim that the Recapitalization vote was wrongfully coerced is based on disclo-

sures in the Proxy: First, the Proxy informed the stockholders that, due to the Family Group's voting control and the likelihood that the Family Group would favor the Recapitalization,[30] "approval of the Recapitalization ... [was] virtually assured." [31] The Proxy further disclosed that the then current NYSE rules "prohibit[ed] voting structures similar to that proposed by the Recapitalization." The Proxy went on to explain that, "[i]f the NYSE's current policy is modified in accordance with the NYSE subcommittee proposal,[32] and if the Recapitalization is approved by the holders of shares entitled to cast two-thirds of the votes at the meeting, then it appears that the Common Stock could continue to trade on the NYSE." Proxy at 17. The effect of these two statements, Williams contends, was impermissibly to coerce the stockholders into voting for the Recapitalization. "[E]ven in light of a valid threat, management actions that are coercive in nature[,] ... force upon shareholders a management sponsored" proposal, or fail adequately to inform the stockholders of all material information, "may be struck down as unreasonable." *Time,* 571 A.2d at 1154.

 Thus, a board of directors seeking stockholder approval of a transaction must walk a fine line between disclosures designed to inform and disclosures which may be seen as coercive. An otherwise valid stockholder vote may be nullified by a showing that the structure or circumstances of the vote were impermissibly coercive. *See, e.g., Lacos Land Co. v. Arden Group, Inc.,* Del.Ch., 517 A.2d 271, 278–79 (1986). Wrongful coercion may exist where the board or some other party takes actions which have the effect of

---

**30.** *See* n. 6 *supra.*

**31.** *See, e.g.,* Jeffrey N. Gordon, *Ties that Bond: Dual Class Common Stock and the Problem of Shareholder Choice,* 79 Cal.L.Rev. 1 (1988) (contending that when management or other group already holds substantial percentage of company stock stockholders may not value their voting rights highly and thus are coerced into approving dual class stock even when it may reduce their chance of receiving a lucrative tender offer).

**32.** For the text of the subcommittee proposal, *see* A.A. Sommer, *et al., Initial Report of the Subcommittee on Shareholder Participation and Qualitative Listing Standards: Dual Class Capitalization* (Jan. 3, 1985) *reprinted in* Sommer, *supra* n. 7, at

app. The subcommittee's recommended changes in the NYSE rules to which the Proxy referred did not materialize. Nevertheless, the Proxy discussed at length the then current situation under the NYSE rules. It went on to discuss the proposed amendments to those rules. The language quoted above was further modified by a number of conditional statements correctly indicating that passage of the amendments to the NYSE rules was not certain, and that, even if the amendments were adopted, the Recapitalization might still cause Milacron's stock to be delisted. The Proxy then discussed at length the effects of delisting and the possibility of trading on NASDAQ or other exchanges.

causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction. *See, e.g., Eisenberg v. Chicago Milwaukee Corp.*, Del.Ch., 537 A.2d 1051, 1061 (1987) (holding corporation's self tender to be impermissibly coercive); *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 112–15 (1986) (same). In the final analysis, however, the determination of whether a particular stockholder vote has been robbed of its effectiveness by impermissible coercion depends on the facts of the case.

The simple answer to Williams' argument in this case is that the Proxy was merely stating facts which were required to be disclosed. These disclosures were neutrally stated and were not threatening in any respect. "Under Delaware law, it is undisputed that when a board of directors 'is required or elects to seek shareholder action,' it is under a duty 'to disclose fully and fairly pertinent information within the board's control.'" *Stroud v. Milliken Enters., Inc.*, Del. Supr., 552 A.2d 476, 480 (1989) ("*Stroud I*") (quoting *Lacos*, 517 A.2d at 279). The Milacron Board was required to disclose the reality of the situation (*i.e.*, that the voting control of the Family Group makes passage of the Recapitalization "virtually assured" and that voting against the Recapitalization may harm the stockholders in that the failure to obtain two-thirds of the voting shares could risk NYSE delisting). The board could not couch these disclosures in vague or euphemistic language or in terms that would deprive the stockholders of their right to choose. The disclosures must be forthright and clear, and they were in this case.

Williams contends that *Lacos* controls this situation and mandates a finding of improper coercion. In *Lacos*, the Court of Chancery struck down a recapitalization with some features similar to those involved here. But that is where the similarity ends. *Lacos* involved blatant threats. In *Lacos*, plaintiffs sought to enjoin a pending recapitalization of the Arden Group pursuant to which a new

class of common stock would be created with ten votes per share. All stockholders would be entitled to exchange their existing common shares for new common shares. The new shares were designed, however, to hold limited attractiveness to ordinary stockholders—they had limited dividend rights and limited transferability. *Lacos*, 517 A.2d at 272–74. The Court of Chancery ultimately enjoined the *Lacos* recapitalization for reasons which are not present here—namely, threats that, unless the new shares were approved, the proponent of the plan would oppose transactions that the board had determined were in Arden's best interests. *Id.*, 517 A.2d at 276; *cf. Kahn*, 638 A.2d at 1114, 1118 (where threats of a controlling stockholder deprived an otherwise "independent committee" of its independence).

*Lacos* is plainly distinguishable from the case at bar. The disclosures in the Milacron Proxy were true, accurate and unvarnished. There is no valid claim that the Proxy was misleading. Unlike the situation in *Lacos*, the Proxy here allowed the stockholders to decide on the basis of the merits of the transaction. The threats made to the stockholders in *Lacos* caused the vote to turn on factors extrinsic to the merits of the transaction. Rather than determining whether the *Lacos* recapitalization was in their best interests, the *Lacos* stockholders were forced to decide between the lesser of two evils: ceding control to a dominant stockholder or losing out on potentially favorable transactions in the future. Conversely, the Milacron Proxy merely presented to the stockholders material [33] information required—as a matter of full disclosure—so that they could determine the relative merits of the Recapitalization.

The possibility of NYSE delisting, which could decrease share value, is certainly a fact that a reasonable stockholder would want to know before casting his or her vote. *See, e.g., Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 2d Cir., 483 F.2d 247, 254 (1973) ("the risk of delisting was sufficiently appreciable to require disclosure.... [and] could

---

**33.** "A[] ... fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Arnold*, 650 A.2d at 1277 (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

certainly have been of importance to a Sonesta shareholder in deciding whether to retain some shares or to tender all"); *see also* *Eisenberg,* 537 A.2d at 1061–62 ("the possibility that shares not tendered will be delisted and/or deregistered ... and its disclosure in the offering materials, without more, has been held to be not wrongfully coercive"). Likewise, the fact that the vote was candidly described as "virtually assured" was something that a reasonable stockholder would want to know. Neither statement could have been omitted or incompletely described. Moreover, inclusion of one fact without the other could have been misleading.

The tension between full disclosure and perceived coercion is clearly present in this case. The alternative of nondisclosure is obviously unacceptable and could have invalidated the vote. The other alternative, which would preclude an amendment which is otherwise valid because of the requirement of full disclosure, would be truly ironic and is likewise clearly unacceptable. Hence, we do not find improper coercion in the disclosures here.

### E. Whether the Result of the Stockholder Vote was "Fair" to the Minority

 Williams contends that the Family Group—due solely to their majority status—benefited from the Amendment and the Recapitalization[34] to a disproportionately greater extent than the minority stockholders. Accordingly, she contends that the Family Group breached its duty of loyalty to the minority, thus requiring that the majority show entire fairness. *See Technicolor,* 663 A.2d at 1162–63. But this argument is misplaced. In *Technicolor,* the business judgment rule was rebutted by the Chancellor's findings that the board of directors acted without the requisite care. When the presumption of the business judgment rule is rebutted either because the board lacked independence (as in *Kahn v. Lynch* and *Nixon v. Blackwell,* for example) or because of lack of due care (as in *Technicolor*), the burden shifts to the defendants to show entire fairness (fair dealing and fair price). That is not the case here. The Milacron board was independent and acted with the requisite care. There were no disclosure violations. Therefore, the entire fairness inquiry articulated in *Technicolor* simply has no application here, and plaintiff's reliance thereon is misplaced.

 As in *Stroud II,* the stockholder vote in favor of the Amendment "was fully informed, and in the absence of any fraud, waste, manipulative or other inequitable conduct, that should have ended the matter on basic principles of ratification." *Stroud II,* 606 A.2d at 92. Strict compliance with the statutory scheme laid out in 8 *Del.C.* § 242(b)(1) will not protect a corporate act if that act involved the excepted misconduct articulated in *Stroud II.*[35] As we stated in *Schnell v. Chris–Craft Industries, Inc.,* Del. Supr., 285 A.2d 437, 439 (1971), for example, "inequitable action does not become permissible simply because it is legally possible." There is no basis for a finding here that the Amendment and Recapitalization involved waste, fraud, or manipulative or other inequitable conduct. Likewise, there is no showing either that the Recapitalization lacked a rational business purpose or that its sole or primary purpose was entrenchment. The burden is on the plaintiff to prove these outer limits on corporate behavior, and plaintiff has not sustained her burden.

---

**34.** A summary of certain of these benefits appears at n. 10 *supra.* *See also* n. 21 *supra.*

**35.** In the instant case, the Board complied with the statutory procedure delineated in 8 *Del.C.* § 242. Actions taken in strict compliance with a statutory scheme will generally not be disturbed by the Court, absent a showing of some inequitable conduct. Upon such a showing, however, the Court may use its equitable powers to invalidate a corporate act despite compliance with applicable legislative guidelines. *See, e.g., Schnell v. Chris–Craft Indus., Inc.,* Del.Supr., 285

A.2d 437, 439 (1971). Absent inequitable or other improper conduct, compliance with a statutory prescription will shield director action from the intervention of the Court. *See Maddock v. Vorclone Corp.,* Del.Ch., 147 A. 255, 256–57 (1929) (holding that amendment to certificate of incorporation removing cumulative voting provision and thereby eliminating ability of minority stockholders to elect a director to the board was permissible because of compliance with relevant statute and absence of inequitable conduct by board).

## VII. CONCLUSION

This is an old case. In the nearly nine years this case has languished in the Court of Chancery, Williams has had ample opportunity to produce some proof of wrongdoing and has failed to do so. Conclusory allegations that the result of the Recapitalization was "unfair" to the minority are not a substitute for analysis or proper pleading and proof of violation of fiduciary duty. It is no answer to say that the statute should not permit the result obtained here even though the Amendment is within the broad powers of Section 242. The quarrel (if any) with the result is not with the application of the statutory authority in this case; it is with the breadth of the statutory authority itself. The remedy is not to ask this Court to fashion some *ad hoc* "relief" for Williams. If we were to engraft here an exception to the statutory structure and authority in order to accommodate Williams' objection to this result, we would be engaging in impermissible judicial legislation. *See Nixon,* 626 A.2d at 1379–81; *Providence & Worcester Co. v. Baker,* Del.Supr., 378 A.2d 121, 124 (1977).[36]

Williams has failed to sustain her burden to show invalidity. The statutory procedure was followed and authorized the adoption of the Amendment. The Board's action in recommending the Recapitalization to the stockholders was the result of an independent business decision of the Board, protected by the presumption of the business judgment rule which was not rebutted. The fully informed stockholder vote approving the Amendment validly effected the Recapitalization. The fact that the Family Group voted in favor of the Amendment does not invalidate the vote, even if they benefited more than the minority. Plaintiff has not alleged or shown a violation of Section 242 or any proof of fraud, waste, manipulative or other inequitable conduct.

Accordingly, the judgment of the Court of Chancery granting summary judgment to defendants is **AFFIRMED.**

HARTNETT, Justice, and HORSEY, Justice (Retired), dissenting:

We respectfully dissent. The question is what is the appropriate standard of review to be employed by the Court of Chancery in reviewing the Milacron Recapitalization Plan that was approved by a vote of the shareholders pursuant to 8 *Del.C.* § 242, the effect of which will inevitably entrench the majority stockholders, to the ultimate detriment of the minority stockholders who did not approve the Plan. The members of the Geier Family Group, the intended and acknowledged beneficiaries of the Plan, "own or control in excess of 50% of the total voting power of the Company's stock and in excess of two-thirds of the Preferred Stock Outstanding." (Proxy

---

**36.** In addition to the specter of impermissible judicial legislation, the relief requested by Williams, if granted, would introduce an undesirable degree of uncertainty into the corporation law. *See Nixon,* 626 A.2d at 1381. Directors and investors must be able to rely on the stability and absence of judicial interference with the State's statutory prescriptions. Nearly fifty years ago, this Court addressed a similar problem in the case of *American Hardware Corp. v. Savage Arms Corp.,* Del.Supr., 136 A.2d 690 (1957). In *American Hardware,* the Court was called upon to evaluate the validity of a corporate act taken pursuant to the corporation's bylaws. The board of Savage Arms accelerated the date of its annual meeting, arguably to thwart an unsolicited tender offer by American Hardware and assist the board in consummating a transaction with its preferred merger partner, Aircraft Armaments Corp. American Hardware contended that the change of the meeting date was impermissible despite compliance with the corporation's bylaws because it adversely impacted on American's tender offer. Chief Justice Southerland, focusing on the Savage board's compliance with the corporation's bylaws, held that "[i]t needs little consideration to realize that the adoption of [American Hardware's] ... view would import serious confusion and uncertainty into corporate procedure." *Id.* at 693. As we held in *American Hardware,* absent a showing of inequitable conduct on the part of the board, compliance with the applicable corporate governance regime (be it statute or bylaw) will generally shield corporate action from judicial interference. *Schnell* cited this principle with approval, but found inequitable conduct. *Schnell,* 285 A.2d at 439; *cf. Kidsco, Inc. v. Dinsmore,* Del.Ch., C.A. Nos. 14649, 14657, 14684, 1995 WL 707859, *9, mem. op. at 18–20, Jacobs, V.C. (Nov. 22, 1995), *aff'd,* Del.Supr., Nos. 481, 482, 1995, 1995 WL 715886, Veasey, C.J. (Nov. 27, 1995) (ORDER) (finding board's unilateral decision to lengthen minimum time for calling stockholder-initiated special meeting to be permissible exercise of power granted to board by company's certificate of incorporation).

Statement set forth in footnote 6 of the Majority's Opinion.) Under these circumstances, neither the business judgment rule nor the shareholder vote shift the burden of persuasion in the required judicial inquiry into the reasonableness of the Recapitalization Plan or its fairness to the minority shareholders.

Furthermore, the existence of controverted facts precluded the Court of Chancery from finding that the Plan was reasonable under the standard articulated in *Unocal* or that the standard articulated in *Blasius* was not applicable.

## I.

We believe the action of the Milacron Board in instituting and recommending adoption of the Recapitalization Plan implicates the duty of loyalty and, therefore, must be subject to full judicial scrutiny, not to judicial deference because of the business judgment rule. The Board's stated reason for the Plan is not dispositive, given the Plan's conceded effect: to confer substantial benefits on the majority shareholders, the Geier Family Group, without conferring similar benefits upon the minority shareholders having equally legitimate, but differing, investment objectives.

The shareholders were informed by the Proxy that shareholder approval of the Plan was "virtually assured." (Footnote 6, majority opinion.) We, therefore, do not believe that the Board's submission of the Recapitalization Plan to the shareholders, pursuant to 8 *Del.C.* § 242, and the approval of it by the same majority shareholders who are the beneficiaries of the Plan lessens judicial scrutiny into the reasonableness of the Plan and its fairness to the minority shareholders.

Even if the shareholder vote was voluntary (which it was not), it would have merely accorded the Plan a presumption of fairness. The Court of Chancery still had a duty to determine whether the power exercised by the Board was oppressive to the minority. *See Davis v. Louisville Gas & Electric Co.,* Del.Ch., 142 A. 654 (1928); *Bailey v. Tubize Rayon Corp.,* D.Del., 56 F.Supp. 418 (1944).

## II.

The majority's reliance on *Stroud v. Grace,* Del.Supr., 606 A.2d 75 (1992), to preclude or lessen judicial review of the Plan is misplaced. In the present case, the Geier Family Group are the controlling shareholders of a **public** corporation. The proposed Plan significantly alters shareholder voting rights to the detriment of those minority shareholders who have no interest in preserving the family ownership, or whose investment objectives may have a different time frame from the Family Group. *Stroud* involved a private, closely held corporation that sought to have adopted a "right of first refusal" charter amendment commonly used by such corporations to preclude the transfer of shares to outsiders. Milacron's status as a public corporation does not permit the Court of Chancery to merely defer to the text of the Recapitalization Plan which has the ultimate effect of turning a public corporation into a *de facto* close corporation.

In *Stroud* this Court relied upon a shareholder vote to cure otherwise suspect board actions involving charter amendments commonly adopted by close corporations. The court found that "[i]n the absence of fraud, a fully informed stockholder vote in favor of even a 'voidable' transaction ratifies board action and places the burden of proof on the challenger." *Stroud,* 606 A.2d at 83.

In the present case, however, the charter amendments worked fundamental changes in the governance of Milacron, as the Proxy concedes. The Recapitalization Plan's ultimate effect will be to confer upon the Geier Family shareholders control not only over the future composition of the Board, but over the strategic long-term planning of the company. A coerced shareholder vote which received the approval of less than 50 percent of the votes of all the unaffiliated [non-Geier Family] shares outstanding cannot be deemed to be a shareholder approval that lessens judicial scrutiny as to the fundamental fairness of the Plan. In our opinion, for there to be a vote that cures a defect, two factors are implicated. First, there must be a full disclosure of the pertinent facts. *Stroud,* 606 A.2d at 84; *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 703 (1983).

Second, the vote must be free from coercion, that is, the shareholder action must be meaningful and voluntary. *Rakestraw v. Rodrigues*, Supr., 8 Cal.3d 67, 104 Cal.Rptr. 57, 60, 500 P.2d 1401, 1404 (1972). *See Eisenberg v. Chicago Milwaukee Corp.*, Del.Ch., 537 A.2d 1051, 1061 (1987); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Ch., 533 A.2d 585, 605, *aff'd*, Del.Supr., 535 A.2d 1334 (1987); *AC Acquisitions Corp. v. Anderson Clayton & Co.*, Del.Ch., 519 A.2d 103, 113–14 (1986); *Lacos Land Co. v. Arden Group, Inc.*, Del. Ch., 517 A.2d 271, 278–79 (1986). The legal imprimatur of a shareholder ratification cannot arise out of a staged and essentially meaningless vote.[37]

Here the minority stockholders were faced with two significant disclosures in the Proxy: (1) the adoption of the Recapitalization Plan was "virtually assured" of approval because of the votes of the Geier Family (the proposers of, and the prime beneficiaries of, the Plan), and (2) the adoption of the proposed Charter Amendment could result in a delisting of Milacron stock from the New York Stock Exchange unless it was ratified by an affirmative vote of ⅔ of all the shares. The minority stockholders, therefore, had no real choice. Nor did a majority of the minority apparently vote for the Plan.[38] (Footnote 12, majority opinion.) Notwithstanding that the shareholder vote was legally sufficient to meet the requirements of 8 *Del.C.* § 242, the burden of persuasion to show the unfairness of the Plan was not shifted to the minority shareholders. *See Schnell v. Chris–Craft Indus., Inc.*, Del.Supr., 285 A.2d 437, 439 (1971).

## III.

In our opinion, the Board's decision proposing and recommending the adoption of the Recapitalization Plan should be subject to a heightened level of judicial scrutiny, under the rationale of *Unocal*, 493 A.2d 946, or *Blasius*, 564 A.2d 651, or both. When the voting rights of minority stockholders are changed without their consent, there is the omnipresent specter of inherent conflict between a board's duty to all the stockholders and the desires of the block of stockholders holding a majority of the shares. This conflict is similar to the conflict that existed in *Unocal*.[39]

Although an action diminishing a shareholder's vote is not invalid, *per se*, the right of an individual stockholder to exercise the voting rights of its shares is a fundamental corporate right. *Tanzer v. Int'l Gen. Indus., Inc.*, Del.Supr., 379 A.2d 1121, 1123 (1977); *Wylain, Inc. v. TRE Corp.*, Del.Ch., 412 A.2d 338, 344 (1980); *Aprahamian v. HBO & Co.*, Del.Ch., 531 A.2d 1204 (1987); *Blasius*, 564 A.2d at 659 n. 2 (1988). The right of franchise must not be diluted except where reasonably necessary to accomplish an appropriate corporate business policy. *Id.*

If the Milacron Board's purpose was to reduce the voting power of the minority shareholders or to increase the voting strength of the Geier Family Group shares, then the Board's action must pass the "compelling justification" standard of scrutiny articulated in *Blasius*. *Stroud*, 606 A.2d at 92 n. 3 (1992). As the majority concedes, the Board's duties were not fulfilled merely by blind compliance with the technical mandates of 8 Del.C. § 242. *See Schnell*, 285 A.2d at 439.

The Court of Chancery's determination that the "compelling justification" standard of *Blasius* was not implicated was apparently based on its conclusory finding that "the recapitalization plan does not interfere with voting rights so as to preclude effective stockholder action." This, however, is contradicted by the Court of Chancery's finding that the Plan has an entrenchment effect. *See Citron v. E.I. DuPont de Nemours & Co.*, Del.Ch., 584 A.2d 490, 500 (1990).

---

37. As the majority opinion notes at footnote 12, apparently 6,406,367 shares were not voted for the Plan.

38. If the Charter Amendment had been put to a separate vote of the minority shareholders they would have had an operative choice and, presumably, an affirmative vote would have relieved the Board of its burden of defending the Plan.

39. For a discussion of the desirability of broadened, enhanced judicial scrutiny, see Martin Lipton and Theodore N. Mirvis, *Enhanced Scrutiny and Corporate Performance: The New Frontier for Corporate Directors*, 20 Del.J.Corp.L. 123 (1995).

The Court of Chancery's finding of the inevitability of the entrenchment of the Geier Family shareholders in the control of Milacron's future is an indisputable fact fully supported by the record through the Proxy Statement, and acknowledged in the Majority's Opinion at op. 1373–1374 and footnote 10. Hence, the Majority's conclusion to the contrary, at op. 1377–1378, is not supported by the record. Because the primary issue is shareholder entrenchment, the directors' motivation and good faith are not dispositive. *Cf. Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638 A.2d 1110, 1112–20 (1994) (recognizing that the appointment of a special committee by a controlling stockholder does not necessarily shift the burden of proving entire fairness from the controlling shareholder).

From a review of the entire record, we are convinced that, notwithstanding the self-serving denials of the proponents of the Plan, its effect on shareholders' voting rights was clearly substantial rather than incidental. The Court of Chancery, in our view, should have held an evidentiary hearing to determine if the Recapitalization Plan has a negative effect on the minority shares and to determine whether the primary purpose of the Plan was to assure the continual control of the corporation by the Geier Family members while permitting them to sell some of their shares.

If the Court of Chancery found these factors existed, it should have reviewed the Plan under the *Blasius* compelling justification standard.

## IV.

In *Stroud*, this Court described the relationship between the tests articulated in *Blasius* and *Unocal* and stated that these tests are not mutually exclusive. *Stroud*, 606 A.2d at 92, n. 3. Although the Court of Chancery improperly, in our view, rejected the "compelling justification" standard of *Blasius*, unlike the majority, we believe that it correctly

found that the action of the Board in adopting the Recapitalization Plan was subject to the heightened judicial scrutiny mandated by *Unocal*. A court must apply the enhanced scrutiny test set forth in *Unocal* whenever the board "adopts any defensive measure taken in response to some threat to corporate policy and effectiveness which touches upon issues of control." *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1144 (1990).

If the purpose of the Recapitalization Plan was defensive, so as to eliminate challenges to control from hostile acquisition offers or proxy contests, as the Proxy suggests, the *Unocal* standard is triggered, as the Court of Chancery properly found. In conducting its *Unocal* analysis, however, the Court of Chancery failed to recognize that genuine issues of material fact existed that precluded its finding that the Recapitalization was a reasonable response to a perceived corporate threat.

From a review of the entire record, we are convinced that there are several disputed issues of fact that must be resolved before the *Unocal* heightened judicial scrutiny as to the proportionality and reasonableness of the Recapitalization Plan can be completed.[40] Among them are: 1) whether the primary purpose of the Recapitalization Plan was to disenfranchise the non-Geier Family shares; 2) whether the Plan's purpose was to substantially reduce the value and marketability of those shares; and 3) whether the primary purpose of the Plan was to enable the Geier Family members to dispose of a substantial portion of their shares and still retain control of the corporation.

Lastly, we find nothing in the text of 8 *Del.C.* § 242(b)(1) that precludes the Court of Chancery from exercising judicial oversight over a Recapitalization Plan with such a disproportionate effect on the minority shares.

## V.

The standard for granting summary judgment is high. Summary judgment should

---

40. An example of how the Recapitalization Plan was structured to favor the Geier Family shareholders is the Plan's provision that a transfer of shares will cause a reversion of the voting rights from 10 votes per share to a single vote per share for 36 consecutive months after a transfer. This provision will not apply, however, to shares of stock given by members of the Geier family to other family members.

not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962). "In discharging this function, the [trial] court must view all the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall–American, Inc.,* Del.Supr., 606 A.2d 96, 99 (1992) (citation omitted).

It is clear from the record that the Recapitalization Plan will increase the relative voting power of the long-term holders of the common stock—who are likely to be Geier Family members. This fact mandates a factual inquiry into the purpose of the Board in adopting and recommending the Recapitalization Plan. If the change in shareholder voting power was an unintended byproduct of a defensive strategy, the heightened scrutiny standard in *Unocal* should be applied. If, however, the facts show that the Board's primary purpose was to dilute the franchise of the non-Geier Family shares, then, under *Blasius,* Defendants "[bear] the heavy burden of demonstrating a compelling justification for such action." *Blasius,* 564 A.2d at 661.

If the facts show that the purpose of the Recapitalization Plan was simply to favor the Geier Family at the expense of the other stockholders, then a breach of the duty of loyalty likely occurred. *See Unitrin,* 651 A.2d at 1375 (a director may be found to be acting independently only when his "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences" (quoting *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 816 (1984)); *Frantz Mfg. v. EAC Indus.,* Del. Supr., 501 A.2d 401, 408 (1985); *Giuricich v. Emtrol Corp.,* Del.Supr., 449 A.2d 232, 239 (1982); *Schnell,* 285 A.2d at 439.

Although we recognize the frustration of the Court of Chancery in attempting to dispose of this suit, which was filed in 1986, the granting of summary judgment must be cautiously invoked so that the parties may always be afforded an evidentiary hearing where there is a bona fide dispute as to the facts. *H & S Mfg. Co. v. Benjamin F. Rich Co.,* Del.Ch., 164 A.2d 447 (1961). A trial court must not weigh the evidence in passing on the motion. *Continental Oil Co. v. Pauley Petroleum, Inc.,* Del.Supr., 251 A.2d 824 (1969).

We believe, therefore, that the case should be remanded to the Court of Chancery for a limited evidentiary hearing to resolve the remaining issues of material fact and for a meaningful review of the Recapitalization Plan in which the proponents of the Plan bear the burden of showing its fairness and reasonableness to the minority shareholders. After resolving the disputed factual issues, the Court of Chancery would be in a position to decide whether the review should be conducted under the enhanced standard of review of *Unocal* or *Blasius.*