COURT OF CHANCERY
OF THE
STATE OF DELAWARE

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:  August 12, 2019
Draft Report:
Date Submitted:   May 13, 2019

Peter K. Schaeffer, Esquire
Avenue Law
1073 South Governors Ave
Dover, DE 19904

R. Eric Hacker, Esquire
Morris James, LLP
107 West Market Street
PO Box 690
Georgetown, DE 19947

Re:   *Marina View Condominium Association of Unit Owners v. Rehoboth Marina Ventures, LLC*
      C.A. No. 2017-0217-PWG

Dear Counsel:

Pending before me is an action by a condominium association against a marina seeking injunctive relief because it alleges the marina breached the lease agreement between the parties by constructing an addition to its marina building for lodging or residential use without the association's permission.  The marina argues that the lease allows it to build an addition and use it for lodging as an accessory use of the marina and the association's approval is not necessary.  The association filed a motion for summary judgment, and the marina responded with

its cross-motion for summary judgment. I find the marina has not violated the lease by constructing the addition, although the lease limits its use of the addition. Accordingly, I recommend that the Court grant both the motion for summary judgment and the cross-motion in part and deny them in part. This is a final report.

## I.  **Background**

On July 25, 2006, Marina Motel Ventures, LLC ("Motel Ventures"), entered into a marina lease ("Lease") with Rehoboth Marina Ventures, LLC ("Marina"), which was recorded in the Sussex County Recorder of Deeds on July 26, 2006. The Lease concerns a marina business used in conjunction with a subaqueous lease that Marina operates on property then owned by Motel Ventures and covers the marina building, adjacent parking and other designated "marina areas." The Lease's initial term was for 99 years, followed by another term of 99 years, unless Marina provides notice of non-renewal. The Lease provides that the leased property shall be used for conducting a marina, "and no part of the Leased Property shall be used for any other purposes without the prior written consent of Lessor."[1] The Lease also provides that Marina may make changes, modifications, alterations, additions and replacements to existing improvements, or add new improvements (all are hereinafter referred to as "changes to improvements"), within the marina

---

[1] Docket Item ("D.I.") 38, Ex. A, ¶5(a).

area "as may be necessary or desirable in the conduct of the [marina], and as permitted by the Town of Dewey Beach and without the consent of Lessor."[2] Acts of default and remedies for default are specified in the Lease.[3]

At or around the time of the Lease's execution, Marina provided marina services out of an improvised structure of two mobile homes in an L-shape, with one home serving as dock master's quarters and the other as a marina bathhouse.[4] In March of 2006 (prior to the Lease's execution), plans ("2006 Plans") were approved by the Town of Dewey Beach ("Town") for a one-story marina building, including retail and storage space, laundry and bathhouse facilities.[5] Elements of the plans reflected an intention to build future second and third floors, but the plans did not indicate any specific use for the proposed floors.[6]

---

[2] *Id.*, ¶7.

[3] For a breach of the lease, other than a default for non-payment of a charge, [Marina] has 15 days after receiving notice of the default from the [Association] to cure the breach, and if they fail to do so, the [Association] "may bring an action to compel [Marina's] performance, and shall be entitled to recover its costs of litigation, including reasonable attorneys' fees, as determined by the Court." *Id.*, ¶20(b).

[4] D.I.77, at 7; D.I. 76, Ex. F.

[5] D.I. 76, Ex. D.

[6] *Id.* Construction specifications, including design loads, pilings and foundation, were designed to accommodate a two-story addition and the roof of the one-story building was designed with sufficient load capacity for a second floor. D.I. 77, at 6. In addition, the 2006 plans, as well as the site plan filed with the Delaware State Fire Marshal's Office for a sprinkler system, noted the marina building was a "future 3-story building.," *Id.*, Exs. D, E. And, at that time, Marina purchased additional Equivalent Dwelling Units from the Town to accommodate additional plumbing for the second and third floors. D.I. 77, at 6.

On or about December of 2016, the Association became aware that Marina was constructing two apartments on the second and third floors of the marina building.[7]  The Association requested that Marina cease and desist such activity as not marina-related, and made a formal objection on January 30, 2017.[8]  Marina responded to the Association, on February 6, 2017, that it believes the construction is "legally undertaken," and there is no basis for stopping construction under the Lease.[9]  Construction continued and Marina obtained a certificate of occupancy for the two apartments from Sussex County on June 16, 2017 and from the Town on August 7, 2017.[10]

The Association filed this action on March 22, 2017.[11]  Count I of the complaint seeks a permanent injunction preventing Marina from the alleged impermissible use of, or the building and maintaining of residences on, the leased

---

[7] D.I. 1, ¶6.  Marina's counsel sent a letter dated December 21, 2016 to the Association's then attorney providing notice, as a courtesy, that Marina had obtained necessary approvals and permits from the Town and Sussex County and was moving forward with constructing a two-story addition on the marina building, as had been planned "to accommodate living space above the Marina Office." D.I. 76, Ex. G.

[8] D.I. 38, Ex. B.

[9] *Id.*, Ex. C.

[10] D.I. 77, Ex. H.

[11] D.I. 1.  The Association also filed an action for summary possession of the leased property in the Justice of the Peace Court on June 14, 2017.  Marina filed a motion to dismiss or stay the proceedings in J.P. Court pending resolution of this litigation and, on July 19, 2017, the J.P. Court stayed the summary possession action pending determination of this case.

property, and requiring Marina to remove all residential-related construction. On April 28, 2017, Marina filed a motion to dismiss the complaint under Court of Chancery Rule 12(b)(7) for failure to join parties under Rule 19, and to dismiss Counts II and III under Court of Chancery Rule 12(b)(6) and Rule 9(b).[12] The Association responded and, after briefing, the Master's Final Report issued on March 6, 2018, and was adopted by the Court on March 20, 2018, denying the motion to dismiss the complaint under Rule 12(b)(7), and granting the motion to dismiss Counts II and Count III under Rule 12(b)(6) and Rule 9(b).[13] Marina filed its answer on April 2, 2018.[14]

The Association moved for summary judgment on April 25, 2018, seeking a permanent injunction preventing Marina from using the leased property to build and maintain residences on the property.[15] Following extensive and lengthy litigation involving discovery, Marina filed a cross-motion for summary judgment on December 12, 2018.[16] Briefing on the motions for summary judgment was completed on January 14, 2019, but the motions were stayed pending decision on a

---

[12] Counts II and III of the complaint sought rescission of the lease based upon failure of consideration, unconscionability, fraud and collusion. *Id.*

[13] D.I. 35, D.I. 36.

[14] D.I. 37.

[15] D.I. 38, at 15.

[16] D.I. 76.

March 28, 2019 motion by the Association seeking to supplement its complaint under Court of Chancery Rule 15(d), alleging that Marina violated the Lease related to the operation of a commercial oyster business on the leased property.[17] After considering the parties' submissions on the motion to supplement the complaint, I denied that motion on May 13, 2019.[18]

## II. Standard for Review

Under Court of Chancery Rule 56, the court grants a motion for summary judgment when "the moving party demonstrates the absence of issues of material fact and that it is entitled to a judgment as a matter of law."[19] The moving party bears the burden of demonstrating that no material issues of fact are in dispute and that it is entitled to judgment as a matter of law.[20] Once the moving party has satisfied that burden, it falls on the non-moving party to show that there are factual disputes. Evidence must be viewed "in the light most favorable to the non-moving party."[21] Summary judgment may not be granted when material issues of fact exist

---

[17] D.I. 83.

[18] D.I. 89.

[19] *Wagamon v. Dolan*, 2012 WL 1388847, at *2 (Del. Ch. Apr. 20, 2012); *see also Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *2 (Del. Ch. Sept. 3, 1996), *aff'd*, 692 A.2d 411 (Del. 1997).

[20] *Wagamon*, 2012 WL 1388847, at *2; *Lundeen v. Pricewaterhousecoopers, LLC*, 2006 WL 2559855, at *5 (Del. Super. Aug. 31, 2006).

[21] *Williams v. Geier*, 671 A.2d 1368, 1389 (Del. 1996) (citing *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99 (Del. 1992)).

or if the Court determines that it "seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[22]

When the court is presented with cross-motions for summary judgment, "neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[23] In evaluating cross-motions for summary judgment, the court examines each motion independently and only grants a motion for summary judgment to one of the parties when there is no disputed issue of material fact and that party is entitled to judgment as a matter of law.[24]

## III. Analysis

The issue is whether the Lease allows Marina to construct and maintain apartments on the leased property without the Association's consent. The Association asks the Court to grant its motion for summary judgment, and deny Marina's cross-motion, arguing that Marina has breached the Lease, and should be

---

[22] *In re Estate of Turner*, 2004 WL 74473, at *4 (Del. Ch. Jan. 9, 2004) (citation omitted); *see also Council of Unit Owners of Breakwater House Condo. v. Simpler*, 1993 WL 81285, at *4 (Del. Super. Feb. 18, 1993) (citation omitted).

[23] *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del. 1988).

[24] *Cf. New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 744 (Del. Ch. 2013), *aff'd,* 105 A.3d 990 (Del. 2014); *Empire of Am. Relocation Servs., Inc.*, 551 A.2d at 435 ("[i]t is imperative that the court consider whether there is a genuine issue of material fact each time such motions are presented"); *Wimbledon Fund LP v. SV Special Situations LP*, 2011 WL 378827, at *7 (Del. Ch. Feb. 4, 2011).

enjoined from building and maintaining residences on the leased property and ordered to remove all residential-related construction. The Association claims that land-based apartment buildings are not marina operations based upon the plain meaning of the language in section 5(a) of the Lease, considering the dictionary definition of "marina," statutory and caselaw descriptions of a marina, and when reading the Lease in its entirety.[25] It alleges the 2006 plans show the proposed use of the building as retail and indicate a one-story building and, since the 2006 plans were submitted prior to the Lease and the Lease is an unambiguous, integrated written agreement, parole evidence bars the introduction of extrinsic evidence.[26] Further, it argues that section 7 of the Lease can be read "in harmony by interpreting the Use Clause [section 5(a)] as a limitation on [Marina's] permitted activities" under section 7.[27]

---

[25] The Association asserts the reasonable meaning of "marina" does not include "land-based residences used for vacation rentals, and, as the lease is commercial, does not reasonably include residences for the owners of the marina." D.I. 79, at 16.

[26] And, the Association points to Marina's operations since 2006 without residential accommodations for staff and that, at the time Lease was executed, the marina premises were used for docking (slip rentals), fuel sale, and supplies, and the Association's members had no notice of Marina's intention to build "commercial vacation properties." D.I. 79, at 21, 33. It asserts Marina has developed "what are essentially additional condominiums not subject to its Declaration of Condominium and related Code of Regulations." *Id.*, at 23.

[27] *Id.*, at 18. The Association refutes Marina's reliance on the Town Code's definition of "marina" as what was intended in the Lease, as factually unsupported. *Id.*, at 35.

Marina responds that it is entitled to summary judgment, and the Association should be denied summary judgment, because it has not breached the Lease. Under the plain language of section 7 of the Lease, which is consistent with section 5(a) of the Lease, Marina asserts it is entitled to make additions to marina improvements for lodging "so long as the Town of Dewey Beach approves," and the Town has approved the addition.[28]  It argues that the Lease's reference to "marina" "means a marina as defined in and permitted by the Town Code."[29]  And, use of the marina area for lodging for Marina's "on-site property manager or marina customers and guests," is consistent with historical use of the property and the intent of the parties to the Lease.[30]

The proper construction of a contract, and interpretation of specific contractual language, "is purely a question of law,"[31] and "[t]he principles governing contract interpretation are well settled."[32]  Under Delaware caselaw, contracts are read "as a whole," "so as not to render any part of the contract mere

---

[28] D.I. 77, at 22.

[29] The Town Code defines "marina" as "[a] place for docking boats or providing services to boats and the occupants thereof, including service, storage and repair to boats, sale of fuel and supplies, and provision of lodging, food, beverages, and entertainment as accessory uses." D.I. 77, at 28 (citing Town of Dewey Beach C. §1-16, "Marina").

[30] D.I. 77, at 25, 29.

[31] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018), *reargument denied,* 2018 WL 5994971 (Del. Ch. Nov. 13, 2018) (citation omitted).

surplusage," or to "render a provision or term 'meaningless or illusory.'"[33]

Contracts are construed to give priority to the intention of the parties.[34] "The true

test is not what the parties to the contract intended it to mean, but what a

reasonable person in the position of the parties would have thought it meant."[35]

The Court gives clear and unambiguous language its "ordinary and usual meaning"

unless a special meaning is intended by the parties.[36] If a contractual term is

undefined, "the interpreting court may consult the dictionary, if that is deemed

useful, when determining the term's plain meaning."[37] Otherwise, courts "consider

extrinsic evidence to interpret the agreement only if there is an ambiguity in the

---

[32] *Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).

[33] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citations omitted); *Ray Beyond Corp. v. Trimaran Fund Mgmt., LLC*, 2019 WL 366614, at *5 (Del. Ch. Jan. 29, 2019) (the "court must avoid interpreting a legal text in a manner that renders provisions superfluous or creates discord or tension between the parts of the text").

[34] *Cf. Norton v. K-Sea Transp. Partners LP*, 67 A.3d 354, 360 (Del. 2013); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[35] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252-53 (Del. 2008); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[36] *Cf. Norton*, 67 A.3d at 360; *Lorillard Tobacco Co.*, 903 A.2d at 739. *See In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 2019 WL 2531162, at *13 (Del. June 20, 2019) ("[w]hen the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions") (citing *Osborn ex rel. Osborn*, 991 A.2d at 1159-60)).

[37] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018), *reargument denied,* 2018 WL 5994971 (Del. Ch. Nov. 13, 2018); *Lorillard Tobacco Co.*, 903 A.2d at 738.

contract."[38]  A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[39]  "Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."[40]

Here, there are no material factual issues, and the issue is the construction and interpretation of the Lease, specifically the language in sections 5(a) and 7 of the Lease, which is a question of law.  Section 5(a) provides:

> Purposes.  Lessee shall use the Leased Property for the purpose of conducting thereon and therefrom a marina, and no part of the Leased Property shall be used for any other purposes without the prior written consent of Lessor.

Section 7 states, in pertinent part:

> Alterations, Changes, Additions.

---

[38] *Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *see also In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 2019 WL 2531162, at *13 (citations omitted).  If the agreement is not ambiguous, the parol evidence rule bars a party from introducing extrinsic evidence to alter, modify, or contradict the terms of a "fully integrated agreement." *Concord Mall, LLC v. Best Buy Stores, LP*, 2004 WL 1588248, at *4 (Del. Super. July 12, 2004) (citations omitted).

[39] *Lorillard Tobacco Co.*, 903 A.2d at 739 (citation omitted); *see also Osborn ex rel. Osborn*, 991 A.2d at 1160 ("The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.").

[40] *Lorillard Tobacco Co.*, 903 A.2d at 739 (citation omitted).

> Lessee may make changes, modifications, alterations, additions and replacements to any improvements located in the Marina Area, or add new improvements within the Marina Area, all as may be necessary or desirable in the conduct of the Rehoboth Marina, and as permitted by the Town of Dewey Beach and without the consent of Lessor.

My purpose is to determine what a reasonable person in the position of the parties would have thought the language in those sections meant, not necessarily what the parties intended it to mean. I must read those sections together, giving effect to each provision if reasonably possible.[41] If the language is unambiguous, I rely on simple facts, and dictionary definitions, from which the language's "ordinary and usual meaning," can be discerned, and not on extrinsic evidence to interpret it.

Reading the Lease as a whole, I do not find that sections 5(a) and 7 conflict. Section 5(a) addresses the overall purpose of the Lease, while section 7 speaks to the specific topic of Marina's ability to make changes to improvements on the leased property. The conduct of a marina is the only allowable purpose for Marina's use of the leased property, under both sections 5(a) and 7. Section 5(a) requires the Association's approval if Marina wishes to use the leased property for a purpose other than to conduct a marina. Section 7 is consistent – it provides that Marina can make changes to improvements located on the leased property without

---

[41] *See Norton v. K-Sea Transp. Partners LP*, 67 A.3d 354, 360 (Del. 2013) ("When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible.")

the Association's approval if two conditions are met: (1) the changes are "necessary or desirable" in the conduct of the marina, and (2) as permitted by the Town. So, section 7 allows Marina to make changes to improvements, without the Association's approval, if the change is necessary or desirable to conducting a marina, which is the overall purpose of the Lease under section 5(a), and if Marina has obtained the necessary permits for making those changes from the Town.

My focus now turns to whether the pertinent language contained in sections 5(a) and 7 is ambiguous, or reasonably susceptible of different interpretations. The critical issue is what is meant in the Lease by the language to "conduct" a "marina." The parties assert different interpretations of the plain meaning of that language. The Association argues that the meaning of "operation of a marina" depends upon the meaning of "marina," and that the plain meaning of "marina" does not include the building or maintenance of land-based apartment buildings, since the dictionary definitions of "marina" focus on a marina as a dock or basin with moorings and supplies for yachts and small boats.[42] Marina alleges that "marina," as stated in the Lease, must be understood to include all uses allowable

---

[42] D.I. 38, 8-9. The Association also notes the absence of any reference to "residential development" in the Delaware Administrative Code's definition of "marina," or facilities adjacent to water that provide for "mooring, berthing or storage of vessels," and include ancillary structures and functions of marinas, such as vessel repair services, vessel sales, sales of supplies normally associated with boating (fuel, bait and tackle), vessel rentals and parking areas. *Id.*, at 9.

under the Town Code for this, or similar, marinas, and the Town Code provides clearer evidence of the parties' objective intent than a dictionary definition.[43] It also points to the dictionary definition of "marina" as "a dock or basin providing secure moorings for pleasure boats and often offering supply, repair, and other facilities."[44] And, it claims the addition of apartments to the marina building is consistent with the historical use of the leased property and the intent of the parties to the Lease, since there were dock master quarters on the leased property prior to the Lease and building plans, that both parties to the Lease were aware of, showing future plans for adding second and third floors to the existing marina building.

I do not find ambiguity in the meaning of "conduct[ing]" a "marina" in the Lease.[45] I consult the dictionary definitions of both words, considering that information as helpful in determining the ordinary and usual meaning of those words. Together, the words mean "to direct or take part in the operation or management of" "a dock or basin providing secure moorings for pleasure boats

---

[43] D.I. 81, at 10.

[44] D.I. 77, at 14 (citing www.merriam-webster.com/dictionary/marina). It notes that the definition of "marina" in the Delaware Administrative Code is contained in regulations that serve a different purpose than the Lease and do not limit the components of a marina. *Id.* at 14-15.

[45] There is no evidence of the parties having a "special intent" with regard to the meaning of the conduct of a marina in the Lease.

and often offering supply, repair, and other facilities."[46]  Marina's reliance on the Town Code to support its provision of lodging for, not only its on-site property manager, but also for its "customers and guests," is misplaced.   I do not interpret section 7 of the Lease as combining the conditions in that section (that the changes are "necessary or desirable" in the conduct of the marina, and are permitted by the Town) to mean that the definition of allowable activities for a marina under the Town Code also defines what is necessary or desirable in the conduct of a marina for purposes of making changes to improvements under the Lease, without the Association's approval.[47]

To give full effect to every provision in section 7, I read it differently – that there are two separate conditions to avoid the Association's approval of changes to improvements: (1) the changes are "necessary or desirable" in the conduct of the marina and (2) they are permitted by the Town.  This interpretation prevents any conflict or discord that would result from defining the overall purpose of the Lease differently than the purpose allowed for changes to improvements.  And, I do not find that a reasonable person would have intended to allow Marina to subvert usage limitations under section 5(a) by making minor changes to improvements

---

[46] https://www.meriam-webster.com/dictionary/conduct (last visited on August 8, 2019); https://www.meriam-webster.com/dictionary/marina (last visited on August 8, 2019).

under section 7 so that a proposed activity permitted under the Town Code, but not under section 5(a), could be undertaken.

However, I also consider the Association's proposed usage definition under the Lease too narrow. I refer to the "ordinary and usual" meaning of the conduct of a marina, and rely on the dictionary definitions of "conduct" and "marina," to conclude that if Marina's activities are directed towards, or a part of, operating or managing the marina, which includes services "providing secure moorings for pleasure boats and often offering supply, repair, and other facilities," then the activity, and a change to an improvement for purpose of performing that activity, is allowed under the Lease without needing the Association's approval to perform it.

I find that providing lodging for an on-site manager who is directly managing the marina's operations is consistent with the plain meaning of conducting a marina.[48] However, providing lodging – or renting apartments – for others, such as Marina's owners, Marina "customers or guests," is not. I do not find a reasonable person would think the Lease intended that the conduct of the marina included providing lodging – or the rental or usage of apartments – to

---

[47] The Town Code, now and at the time the Lease was executed, includes the provision of lodging if it is an accessory use of a marina in its definition of a marina. D.I. 77, at 28 (citing Town of Dewey Beach C. §1-16, "Marina").

[48] And, Marina maintained dock master's quarters on the leased property around the time the Lease was executed. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728,

Marina's owners, customers, and guests.[49] Marina leases boat slips to its members, some of whom live on their boats,[50] and the marina building has bathhouse facilities on the first floor for use by its members and their guests, so it is not readily apparent why having apartments available to use (or rent), other than for use by Marina's on-site property manager or similar activities, is "necessary or desirable" for the "conduct of a marina."

It is not the provision of lodging, in itself, that violates the Lease, but when that lodging is inconsistent with the purposes articulated in the Lease – to conduct a marina. The use of the apartments by Marina's customers and guests, which is one of the uses indicated by Marina here, exceeds the plain meaning of conducting the marina under the Lease. Because I find the language at issue unambiguous, I do not consider extrinsic evidence to interpret the Lease.[51]

---

739 (Del. 2006) (the court considers "simple facts" from which the nature of the language and the meaning of the contract can be discerned).

[49] It is not clear how Marina defines its customers and guests, including how broadly (or narrowly) it defines that group. The Association alleges that the apartment(s) are leased as vacation rentals and used by Marina's owners. If true, such usage is outside of the "ordinary and usual" meaning of conducting a marina.

[50] D.I. 77, at 7.

[51] If I were to find "conduct of a marina" ambiguous and consider extrinsic evidence to aid in my construction, I would come to the same conclusion. The Town Code and the Sussex County Code include the provision of lodging as an accessory use of their definitions of a marina, while the Delaware Code and Marina regulations omit lodging under related ancillary functions of marinas in their definitions of "marina." These definitions focus on different purposes and none is directly implicated in the Lease for defining "marina." Further, the evidence shows the existence of dock master's quarters

I find Marina has not violated the Lease *per se* by constructing and maintaining apartments but those apartments must be used for purposes consistent with the Lease – the conduct of a marina, which includes use by Marina's on-site property manager so long as that manager is providing services on-site directly related to managing Marina operations. However, use of the apartments for Marina's customers and guests, or for Marina's owners if they are not acting as the on-site property manager consistent with the Lease, represents a breach of the Lease.

Next, I determine what relief is appropriate under the circumstances. The Association seeks a permanent injunction preventing Marina from using, building or maintaining of residences on the leased property, and requiring Marina to

on the property around the time the Lease was executed, and the 2006 building plans, which were developed and approved by the Town before the Lease was executed, depict a one-story building, with retail, storage, laundry and bathhouse facilities. The plans indicate there may be future additions to the building, but provide no detail as to the additions. The parties to the Lease, which were entities controlled by similar persons, may have understood the future plan was to add two apartments for lodging or rental (as shown by the extra EDUs purchased), but a reasonable person looking at what the Lease intended would not have known that a future addition was definite, or the specific purpose of that addition would be to construct two apartments to use for Marina customers and guests. However, the fact that no residential units were constructed between 2006 – when the lease was entered into – and 2016, does not show that an on-site manager's living facility is not needed. Further, the Marina is excluded as a unit owner under the Declaration of the Marina View Condominium, so the marina building apartments have no rights, or obligations, under the Declaration. For example, the apartments do not have to comply with the same external design restrictions as other condominium units. It seems likely that considerations related to those units would have

remove all residential-related construction, as well as attorneys' fees. To obtain permanent injunctive relief, the party must show success on the merits and that, absent the relief, it will suffer irreparable harm and the equities balance in its favor.[52] If the violator's conduct was willful and inexcusable, courts have considered that conduct in determining injunctive relief.[53]

Here, I recommend the granting of injunctive relief preventing Marina from using either apartment as residential units for Marina customers and guests, or for other uses that are inconsistent with the purpose of the Lease, as discussed in this report. I find it consistent with the purpose of the Lease for Marina's on-site property manager to use an apartment, so long as that manager is providing services on-site directly related to managing Marina operations. And, I do not find that the circumstances warrant ordering the removal of any of the apartments, but restrict their usage to be consistent with the purpose set forth in the Lease (for example, it could be used for storage, retail, laundry, bathhouse facilities, or other

---

been addressed in the Lease, if rental condominium units were envisioned as a part of Marina's future operations.

[52] *Cf. N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380, n. 47 (Del. 2014), *as revised* (Nov. 10, 2014); *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *22 (Del. Ch. Oct. 30, 2015), *judgment entered,* (Del. Ch. 2015), and *order clarified,* (Del. Ch. 2015); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009), *aff'd,* 7 A.3d 486 (Del. 2010).

[53] *Pomilio v. Caserta*, 206 A.2d 850, 853 (Del. Ch. 1964), *aff'd,* 215 A.2d 924 (Del. 1965) ("[i]t is well established in Delaware that one seeking injunctive relief must do equity"); *Hollingsworth v. Szczesiak*, 84 A.2d 816, 822 (Del. Ch. 1951).

similar purposes), since Marina's conduct was not inexcusable, and the evidence does not show that the existence of the apartments, so long as they are used for proper purposes, causes harm that warrants their removal.

Finally, the Association requests attorneys' fees and costs. That issue will be addressed at a later time, following supplemental submissions by the parties on that issue within 20 days after this report becomes final.

## IV.    **Conclusion**

For the foregoing reasons, I recommend the Court grant the Association's motion for summary judgment, in part, as relates to Marina's use of apartments in violation of the Lease, and order that Marina be enjoined from using the apartments as residential units for Marina customers and guests, or for other uses that are inconsistent with the purpose of the Lease. And, I recommend the Court find the Association is not entitled to summary judgment on its request for the Court to order Marina to remove the apartments. With regard to Marina's cross-motion for summary judgment, I recommend the Court find Marina is entitled to summary judgment allowing the construction and maintenance of apartments so long as the apartments are used consistent with the purpose contained in the Lease, which includes the use of an apartment by Marina's on-site property manager. Finally, the Association's request for attorneys' fees and costs will be addressed

later.  This is a final report and exceptions may be taken under Court of Chancery

Rule 144.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery